949 A.2d 68

**Louis Charles PADILLA**

v.

**STATE of Maryland.**

**No. 212, Sept. Term, 2007.**

Court of Special Appeals of Maryland.

May 30, 2008.

William J. Morrow (Kenneth W. Ravenell, Schulman, Treem, Kaminkow, Gilden & Ravenell, PA, on brief), Baltimore, for appellant.

Carrie J. Williams (Douglas F. Gansler, Atty. Gen., on brief), for appellee,

Panel: KRAUSER, C.J., HOLLANDER and WOODWARD, JJ.

HOLLANDER, J.

At a bench trial in the Circuit Court for Cecil County, Louis Charles Padilla, appellant, proceeded by way of an agreed statement of facts and was convicted of possession of heroin with intent to distribute, in violation of Md.Code (2002, 2007 Supp.), § 5–602(2) of the Criminal Law Article ("C.L."). He was sentenced to seven years of incarceration, with all but three years suspended.

At issue here is appellant's pre-trial motion to suppress the narcotics seized from a hidden compartment of his vehicle during a traffic stop. The vehicle search occurred after a police dog alerted to the presence of the contraband. Appellant poses one question for our consideration: "Did the trial court err in denying appellant's motion to suppress evidence?"

Appellant concedes that suppression was not required under the Fourth Amendment. However, he urges this Court to reverse based on Article 26 of the Maryland Declaration of Rights. In his view, Article 26 requires reasonable, articulable suspicion to conduct a dog scan, which he alleges was not present here. For the reasons that follow, we shall affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

On August 3, 2005, appellant was pulled over for speeding while on southbound I–95. During the course of the traffic stop, a police drug dog alerted to the presence of illegal drugs. A subsequent search of the vehicle revealed a hidden compartment containing over 1,500 grams of heroin. As a result, appellant was arrested and charged with possession of heroin with intent to distribute under C.L. § 5–602(2).[1]

---

1. Appellant was also charged with two other offenses arising out of the incident, which were later *nol prossed* by the State.

On December 19, 2006, the court held a hearing on appellant's motion to suppress the drugs seized from his vehicle. No testimony was taken. Rather, the parties submitted an agreed statement of facts, presented orally by the prosecutor, and argued their respective legal positions. A summary of the facts presented at the suppression hearing follows.[2]

On August 3, 2005, Trooper First Class Kennard of the Maryland State Police [3] was operating a stationary laser in the area of I–95 southbound at the 99–mile marker in Cecil County, when he observed a green Honda Accord traveling southbound at a speed he believed exceeded the posted speed limit of 65 mph. After pointing his radar gun at the vehicle, Kennard obtained a speed reading of 73 mph. At approximately 8:29 p.m., he initiated a traffic stop near the 97.3 mile marker of southbound I–95.

Trooper Kennard approached the vehicle and made contact with appellant, who was the driver and sole occupant of the vehicle. Appellant gave the officer a New York "temporary license" bearing the name "Melvin Allen," but lacking a photograph. Upon questioning about the ownership of the vehicle, appellant advised the trooper that he did not own the car. He explained that the vehicle was owned by and registered to his sister, who lived in North Carolina. Appellant initially told the trooper that his sister's name was "Sandra Lane," but later told the Trooper that his sister's name was "Sandra Allen." In addition, appellant told the trooper that he was driving the vehicle to High Point, North Carolina to return the car to his sister. However, appellant could not provide his sister's specific address in North Carolina, and told the trooper that he was going to contact her for directions upon his arrival in the area. While conversing with appellant, Trooper

---

2. As we discuss, *infra,* several facts about the incident were not introduced until the trial phase of the proceedings, and thus were not before the court when it considered the suppression motion. At this point, we shall present only the facts offered at the suppression hearing.

3. The record does not reflect Kennard's first name.

Kennard "smelled an overwhelming smell of air freshener coming from the car." [4]

Upon receipt of Mr. Padilla's "temporary license," Trooper Kennard went back to his patrol vehicle and asked dispatch to perform a check on the vehicle's registration and on the driver's license. On the basis of appellant's representations and the circumstances, which the prosecutor characterized as "criminal indicators," the trooper also radioed for a K–9 unit to conduct a scan of the vehicle.

Minutes later, at approximately 8:41 p.m., Trooper First Class Joseph Catalano, a certified Maryland K–9 handler, arrived with "Bruno," his drug detection dog, and performed a scan of the exterior of the vehicle. Approximately twelve minutes after the initiation of the traffic stop, the drug dog alerted to the presence of a controlled dangerous substance in the vehicle. By the time the dog alerted, however, Trooper Kennard "still hadn't received anything back regarding the defendant's ... identity.... [N]othing was coming back on that license...." Therefore, the traffic stop had not yet concluded.

As a result of the alert, Trooper Kennard conducted a search of the interior of the vehicle. He noticed an irregularity in the side wall of the driver's side rear passenger area and discovered a hidden compartment behind the side wall secured by a hydraulic piston. Inside the compartment were two large plastic-wrapped packages containing a total of nearly 1,600 grams of heroin, equal to over 3 pounds. Appellant was then arrested.

---

4. In his brief, appellant states that the trooper *"allegedly* smelled an 'overwhelming' odor of air freshener coming from the vehicle," (emphasis added), and notes that there was no indication in the statement of facts that the trooper saw any air fresheners in the vehicle. The State takes issue with appellant's characterization of the "alleged" odor, pointing out that the suppression hearing "proceeded by way of an agreed statement of facts," and appellant did not object to the prosecutor's assertion that the officer "smelled an overwhelming smell of air freshener coming from the car."

The court then heard argument on the motion. In sum, appellant claimed that, under Article 26 of the Maryland Declaration of Rights, police must have reasonable, articulable suspicion of illegal drugs before conducting a dog scan. Further, he argued that reasonable, articulable suspicion was not present in this case.

Further, defense counsel alleged that the Maryland State Police "currently have in place a policy requiring that there be reasonable, articulable suspicion before the police can conduct a dog scan." Appellant's attorney indicated that the policy was instituted pursuant to a settlement agreement in a suit between the ACLU and the Maryland State Police.[5] According to defense counsel, the policy requires State troopers to fill out an "MSP–130" form that sets out their reasons for any search or dog scan. Without objection, defense counsel introduced an MSP–130 form filled out by Trooper Kennard pursuant to his stop of appellant. It described the trooper's grounds for conducting the K–9 scan of appellant's vehicle, as follows: "Driver did not have a valid form of identification. The driver did not know who the registered owner of the vehicle was or where he was taking it. The drivers [sic] hands were shaking and his breathing was shallow and rapid when he handed me his license."

The State responded that, under *Illinois v. Caballes*, 543 U.S. 405, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005), the Fourth

---

**5.** Defense counsel apparently was referring generally to the federal litigation in *Wilkins v. Maryland State Police,* and specifically either to the original settlement agreement in *Wilkins,* Civ. No. MJG–93–468 (D.Md. Jan. 5, 1995), or the later consent decree, Civ. No. CCB–93–468/CCB–98–1098 (D.Md. Apr. 22, 2003). The 1995 settlement agreement required the Maryland State Police ("MSP") to collect data on the grounds for use of drug dogs, but neither the 1995 agreement nor the 2003 consent decree expressly required that all dog scans be supported by reasonable suspicion. Instead, the 2003 consent decree provided that "MSP affirms that it will continue to obey the laws of the United States and Maryland regarding the use of canines in automobile searches, and specifically that MSP policy on the use of canines will continue to prohibit detention of an automobile and its passengers to provide time for arrival of a canine unit, unless there exists reasonable suspicion or probable cause to believe a crime has been or is being committed."

Amendment does not require police to have reasonable, articulable suspicion to conduct a dog scan, and opposed appellant's argument for extension of Maryland constitutional law. Moreover, the State contended that, even if reasonable and articulable suspicion were required, it was present under the circumstances attendant here.

Before ruling on the motion, the court remarked: "I think it is a trial judge's job to make decisions and rulings that can be structured in such a fashion that an important issue or point of law is framed for an appellate court should they desire to address it." After reviewing relevant case law, the court made the following findings:

> First, the traffic stop of the defendant was lawful; second the officers had reasonable, articulable suspicion to request a K–9 scan and they complied with their own internal procedures or policies regarding that, specifically Defendant's Exhibit No. 1 [the MSP–130 form]; third, I find in accordance with the foregoing cases that a K–9 sniff is not a search under the Fourth Amendment of the United States Constitution or under the Maryland Declaration of Rights as that is presently interpreted by Maryland courts; fourth, I find that reasonable suspicion existed for both the K–9 sniff and the subsequent search and seizure of [heroin] from the car that the defendant was operating.

The matter then proceeded to the trial phase, at which appellant waived his right to a jury trial. The prosecutor presented an additional agreed statement of facts, which provided more details regarding the traffic stop, search, and arrest. According to the agreed statement, "[o]nce Mr. Padilla was placed under arrest and taken back to the barrack, he was later identified, having run his prints, as being Louis Padilla from Brooklyn, New York." [6]

---

6. The trial-phase statement of facts made clear that Trooper Kennard radioed for the K–9 unit at the same time that he requested a check on appellant's license and the vehicle's registration. Trooper Kennard was informed by dispatch, prior to the arrival of the K–9 unit, "that the vehicle was actually dual registered. The registration came up for the

## DISCUSSION

 When we review a trial court's ruling on a motion to suppress, we look only to the record of the suppression hearing. *Owens v. State*, 399 Md. 388, 403, 924 A.2d 1072 (2007). We do not consider information from the trial record when ruling on a pre-trial motion to suppress evidence. *Paulino v. State*, 399 Md. 341, 348, 924 A.2d 308 (2007).[7] Moreover, we "do not engage in *de novo* fact-finding." *Haley v. State*, 398 Md. 106, 131, 919 A.2d 1200 (2007). Instead, we "extend great deference to the findings of the motions court as to first-level findings of fact and as to the credibility of witnesses, unless those findings are clearly erroneous." *Brown v. State*, 397 Md. 89, 98, 916 A.2d 245 (2007). In addition, we " 'view the evidence and inferences that may be reasonably drawn therefrom in a light most favorable to the prevailing party on the motion. . . .' " *Owens*, 399 Md. at 403, 924 A.2d 1072 (quoting *State v. Rucker*, 374 Md. 199, 207, 821 A.2d 439 (2003)). We then make "an independent, de novo, constitutional appraisal by applying the law to the facts pre-

---

vehicle to a Therese Allen in Highpoint, North Carolina as well as a Nikesh a Nicole Smith in Baltimore, Maryland; the vehicle, again, registered in two states." It was not until Trooper Kennard began the search of the vehicle, after the dog had already alerted, that "the driver's license check on Melvin Allen [the name on the New York 'interim license' produced by appellant] came back as the fact that the dispatch could find nothing on said driver." This sequence of events was not made entirely clear at the motion phase.

In his brief, appellant notes the timing of the events, and argues that the license and registration information cannot be included in the analysis of reasonable, articulable suspicion because Kennard did not receive the information until after he had the results from the license check.

7. In the context of discussing the motion to suppress, both sides erroneously included in their briefs some of the factual details presented at the trial phase. For example, as to the suppression hearing, both parties assert in their briefs that appellant could not produce the registration card for the vehicle. This fact was not adduced until trial. Additionally, the State indicates in its brief that, "after [appellant] stated that the vehicle belonged to his sister . . . Trooper Kennard asked Padilla if he knew his sister's telephone number, to which Padilla responded that he did not." This exchange was included in the agreed statement of facts at the trial phase, not at the motion phase.

sented in a particular case." *Williams v. State,* 372 Md. 386, 401, 813 A.2d 231 (2002).

■ The Fourth Amendment to the United States Constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." It protects against unreasonable searches and seizures. *Whren v. United States,* 517 U.S. 806, 809–10, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996).

Appellant concedes that the Fourth Amendment offers him no relief, and that no controlling Maryland precedent presently creates an exclusionary rule for dog scans that are not supported by reasonable, articulable suspicion. Nevertheless, appellant points to *Fitzgerald v. State,* 384 Md. 484, 864 A.2d 1006 (2004), claiming that in that case the Court explicitly declined to decide whether Article 26 of the Maryland Declaration of Rights provides such an exclusionary rule. He suggests that the case *sub judice* is an appropriate vehicle to revisit the question. As we see it, the question is not one for this Court to decide.

Although appellant concedes that the dog scan was permissible under the Fourth Amendment, Fourth Amendment jurisprudence is our starting point. In *Lewis v. State,* 398 Md. 349, 920 A.2d 1080 (2007), the Court of Appeals summarized the relevant case law with regard to traffic stops. It said, *id.* at 360–62, 920 A.2d 1080 (footnote omitted):

The Fourth Amendment to the United States Constitution, made applicable to the States by the Fourteenth Amendment, protects against unreasonable searches and seizures. *Whren v. United States,* 517 U.S. 806, 809–10, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996); *United States v. Mendenhall,* 446 U.S. 544, 550, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980); *Terry v. Ohio,* 392 U.S. 1, 8, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The Supreme Court has iterated that

the "[t]emporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]." *Whren*, 517 U.S. at 809–10, 116 S.Ct. 1769.

The Fourth Amendment, however, is not "a guarantee against *all* searches and seizures, but only against *unreasonable* searches and seizures." *United States v. Sharpe*, 470 U.S. 675, 682, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985) (emphasis added). Therefore, "[t]he touchstone of our analysis under the Fourth Amendment is always 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.'" *Pennsylvania v. Mimms*, 434 U.S. 106, 108–09, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977), quoting *Terry*, 392 U.S. at 19, 88 S.Ct. 1868. In assessing the reasonableness of a traffic stop, the Supreme Court has adopted a "dual inquiry," examining "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Sharpe*, 470 U.S. at 682, 105 S.Ct. 1568, quoting *Terry*, 392 U.S. at 20, 88 S.Ct. 1868.

\* \* \*

A traffic stop is justified under the Fourth Amendment where the police have a reasonable suspicion supported by articulable facts that criminal activity is afoot. *Whren*, 517 U.S. at 812–13, 116 S.Ct. 1769; *Myers v. State*, 395 Md. 261, 281, 909 A.2d 1048 (2006); *Cartnail v. State*, 359 Md. 272, 284–85, 753 A.2d 519 (2000). Thus, a traffic stop violates the Fourth Amendment where there is no

> reasonable suspicion that the car is being driven contrary to the laws governing the operation of motor vehicles or that either the car or any of its occupants is subject to seizure or detention in connection with the violation of any other applicable laws.

*Delaware v. Prouse,* 440 U.S. 648, 650, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979); *Rowe v. State,* 363 Md. 424, 433, 769 A.2d 879 (2001).

■ We pause to review the "reasonable, articulable suspicion" standard referenced in *Lewis,* because it is central to appellant's claim. It derives from *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). There, the Supreme Court held that a police officer may briefly detain a person "for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest," *id.* at 22, 88 S.Ct. 1868, so long as the officer is "able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* at 21, 88 S.Ct. 1868. The reasonable suspicion standard requires the police to possess " 'a "particularized and objective basis" for suspecting legal wrongdoing.' " *Collins v. State,* 376 Md. 359, 368, 829 A.2d 992 (2003) (quoting *United States v. Arvizu,* 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002)). *Accord Lewis,* 398 Md. at 362, 920 A.2d 1080; *Myers v. State,* 395 Md. 261, 281, 909 A.2d 1048 (2006). It is a " 'less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence.' " *State v. Nieves,* 383 Md. 573, 589, 861 A.2d 62 (2004) (quoting *Illinois v. Wardlow,* 528 U.S. 119, 123, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000)). On the other hand, the standard requires more than a mere " 'inchoate and unparticularized suspicion or hunch.' " *Cartnail,* 359 Md. at 287, 753 A.2d 519 (quoting *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989)).

■ Whether reasonable suspicion exists in a given case is determined based on the totality of the circumstances. "Even though each of a series of acts is innocent standing alone, taken together they can constitute reasonable suspicion." *Nathan v. State,* 370 Md. 648, 664, 805 A.2d 1086 (2002). *See Arvizu,* 534 U.S. at 274, 122 S.Ct. 744. Nevertheless, " 'it is impossible for a combination of wholly innocent factors to combine into a suspicious conglomeration unless

there are concrete reasons for such an interpretation.' " *Cartnail,* 359 Md. at 294, 753 A.2d 519 (citation omitted).

█ In *Whren,* 517 U.S. 806, 116 S.Ct. 1769, the Supreme Court held that a law enforcement officer may effect a traffic stop whenever he observes a traffic violation, even if the officer's subjective motivation for the stop is not the traffic violation itself, but the hope that the stop will enable the officer to discover evidence of some other crime. Evidence of the unrelated crime will not be suppressed so long as it was obtained within the scope of the original traffic stop. *Id.*

The Court of Appeals explained in *Ferris v. State,* 355 Md. 356, 735 A.2d 491 (1999), that there are limitations with respect to the length of a lawful traffic stop. It said, *id.* at 372, 735 A.2d 491 (internal citations omitted):

[T]he officer's purpose in an ordinary traffic stop is to enforce the laws of the roadway, and ordinarily to investigate the manner of driving with the intent to issue a citation or warning. Once the purpose of that stop has been fulfilled, the continued detention of the car and the occupants amounts to a second detention. Thus, once the underlying basis for the initial traffic stop has concluded, a police-driver encounter which implicates the Fourth Amendment is constitutionally permissible only if either (1) the driver consents to the continuing intrusion or (2) the officer has, at a minimum, a reasonable, articulable suspicion that criminal activity is afoot.

The Supreme Court articulated the same principle in *Illinois v. Caballes,* 543 U.S. 405, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005). It said, *id.* at 407–408, 125 S.Ct. 834 (internal citations omitted):

It is ... clear that a seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution. A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission.

The *Caballes* Court concluded that a scan by a drug detection dog during a lawful traffic stop "generally does not implicate legitimate privacy interests," *id.* at 409, 125 S.Ct. 834, and is thus permissible, without any additional justification, so long as the stop is not prolonged for the purpose of conducting the scan. The Supreme Court reasoned that because "governmental conduct that *only* reveals the possession of contraband 'compromises no legitimate privacy interest,'" a sniff from a drug detection dog "does not rise to the level of a constitutionally cognizable infringement." *Id.* at 408, 409, 125 S.Ct. 834 (emphasis in original; internal citations omitted).

Clearly, *Caballes* did not alter the constitutional landscape in Maryland. Instead, it confirmed the interpretation of the Fourth Amendment that Maryland courts had applied for many years. *See, e.g., Fitzgerald, supra,* 384 Md. at 503, 864 A.2d 1006; *Wilkes v. State,* 364 Md. 554, 573, 774 A.2d 420 (2001); *Whitehead v. State,* 116 Md.App. 497, 506, 698 A.2d 1115 (1997); *In re Montrail M.,* 87 Md.App. 420, 435, 589 A.2d 1318 (1991); *Snow v. State,* 84 Md.App. 243, 259, 578 A.2d 816 (1990). *See also Nathan,* 370 Md. 648, 805 A.2d 1086 (illustrating traffic stop principles, although not involving a drug detection canine); *Seldon v. State,* 151 Md.App. 204, 824 A.2d 999 (2003) (same); *Charity v. State,* 132 Md.App. 598, 753 A.2d 556 (2000) (same); *Munafo v. State,* 105 Md.App. 662, 660 A.2d 1068 (1995) (same).

A comparison of *In re Montrail M.* and *Snow* illuminates the rule barring the deliberate prolonging of a traffic stop in order to conduct a drug dog scan. We quote from *In re Montrail M.,* 87 Md.App. at 436–37, 589 A.2d 1318 (internal citations omitted):

In *Snow,* a police officer, who had a trained dog in his police car, stopped a vehicle in order to issue the driver a speeding ticket. After the ticket was written, the officer continued the detention in order to remove the dog from his cruiser and conduct a scan. We noted that the officer had actually engaged in two separate detentions—one to issue the ticket and the other to conduct the scan. Because the officer had no reasonable, articulable suspicion as to drug-

related activity, we found that the second detention was unjustified.

Only one detention occurred in the case *sub judice [i.e., Montrail M.].* The trained dog arrived on the scene while Deputy Owens was still running a check on Matio C.'s license and registration, and the scan took place as the deputy completed the check. In short, the initial detention of the appellants was based on a reasonable, articulable suspicion, and no additional Fourth Amendment rights were implicated by the canine scan of Matio C.'s station wagon.

 Therefore, under the Fourth Amendment, "[u]sing a dog is accepted as a perfectly legitimate utilization of a free investigative bonus as long as the traffic stop is still genuinely in progress." *State v. Ofori,* 170 Md.App. 211, 235, 906 A.2d 1089 (2006). But, "[o]nce a traffic stop is over, there is no waiting for the arrival, even the imminent arrival, of the K–9 unit." *Id.* As Judge Moylan wrote for the Court, the use of a drug dog in a traffic stop is "an effective investigative tool if the police can squeeze it in before the buzzer sounds...." *Id.* at 238, 906 A.2d 1089.

Appellant does not dispute that there was reasonable suspicion to justify his initial traffic stop for speeding. Moreover, given that the dog alerted within twelve minutes of the inception of the traffic stop, at a point when Trooper Kennard had not yet received the results of the registration and license check, appellant does not contend that the traffic stop was impermissibly extended in order to conduct the scan. Nor does appellant dispute that the dog's alert provided the trooper with probable cause to further detain appellant and to search the vehicle. *See Wilkes,* 364 Md. at 586, 774 A.2d 420 ("[O]nce a drug dog has alerted a trooper 'to the presence of illegal drugs in a vehicle, sufficient probable cause exist[s] to support a warrantless search of [a vehicle].'" (Internal citations omitted.)); *State v. Cabral,* 159 Md.App. 354, 376–81, 859 A.2d 285 (2004) (concluding that a drug dog's alert generated probable cause for a search). For these reasons, appellant recognizes that the Fourth Amendment is not implicated here.

Instead, appellant stakes his suppression claim on Article 26 of the Maryland Declaration of Rights. It provides:

That all warrants, without oath or affirmation, to search suspected places, or to seize any person or property, are grievous and oppressive; and all general warrants to search suspected places, or to apprehend suspected persons, without naming or describing the place, or the person in special, are illegal, and ought not to be granted.

Appellant urges us to consider decisions from several other states, in which those courts have determined that their state constitutional analogs to the Fourth Amendment require reasonable suspicion prior to a dog scan. *See Commonwealth v. Rogers,* 578 Pa. 127, 849 A.2d 1185, 1190–91 (2004) (citing *Commonwealth v. Martin,* 534 Pa. 136, 626 A.2d 556 (1993), and *Commonwealth v. Johnston,* 515 Pa. 454, 530 A.2d 74 (1987)); *People v. Cox,* 318 Ill.App.3d 161, 251 Ill.Dec. 133, 739 N.E.2d 1066, 1070–71 (2000) (citing *People v. Easley,* 288 Ill.App.3d 487, 223 Ill.Dec. 826, 680 N.E.2d 776 (1997)); *State v. Pellicci,* 133 N.H. 523, 580 A.2d 710, 717–18 (1990). The State responds that "the plain language of Article 26 is vastly different from the language of the state constitutional provisions on which Padilla relies." As the State observes, the relevant constitutional provisions of Pennsylvania, Illinois, and New Hampshire all contain a textual prohibition on "unreasonable searches and seizures," *see* Ill. Const., art. I, § 6; N.H. Const., Pt. I, art. 19; Pa. Const., art. I, § 8, but no such provision is found in Article 26. Rather, the State notes that Article 26 "addresses only the requirements and limitations of a warrant...."[8]

---

8. As *Terry* makes clear, the source of the federal *"reasonable* suspicion" standard is the Fourth Amendment's express prohibition against *"unreasonable* searches and seizures." The *Terry* Court explained, 392 U.S. at 20–21, 88 S.Ct. 1868 (internal citations omitted):

[T]he conduct involved in this case must be tested by the Fourth Amendment's general proscription against unreasonable searches and seizures.... And in justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.

 In considering appellant's Article 26 claim, we observe that the cases are legion in which Maryland courts have construed Article 26 *in pari materia* with the Fourth Amendment to the United States Constitution.[9] *See, e.g., Parker v. State,* 402 Md. 372, 400, 936 A.2d 862 (2007); *Patterson v. State,* 401 Md. 76, 113, 930 A.2d 348 (2007); *Byndloss v. State,* 391 Md. 462, 465 n. 1, 893 A.2d 1119 (2006); *Davis v. State,* 383 Md. 394, 408, 859 A.2d 1112 (2004); *Scott v. State,* 366 Md. 121, 139, 782 A.2d 862 (2001); *Richardson v. McGriff,* 361 Md. 437, 452–53, 762 A.2d 48 (2000); *Gadson v. State,* 341 Md. 1, 8 n. 3, 668 A.2d 22 (1995); *Gamble v. State,* 318 Md. 120, 123 n. 2, 567 A.2d 95 (1989); *State v. Smith,* 305 Md. 489, 513 n. 9, 505 A.2d 511 (1986); *Potts v. State,* 300 Md. 567, 576, 479 A.2d 1335 (1984); *Gahan v. State,* 290 Md. 310, 319–20, 430 A.2d 49 (1981); *Liichow v. State,* 288 Md. 502, 509 n. 1, 419 A.2d 1041 (1980); *Merrick v. State,* 283 Md. 1, 4 n. 2, 389 A.2d 328 (1978); *Givner v. State,* 210 Md. 484, 492, 124 A.2d 764 (1956); *Johnson v. State,* 193 Md. 136, 144, 66 A.2d 504 (1949); *Blum v. State,* 94 Md. 375, 382, 51 A. 26 (1902); *Purnell v. State,* 171 Md.App. 582, 607, 911 A.2d 867 (2006), *cert. denied,* 398 Md. 315, 920 A.2d 1060 (2007); *Blasi v. State,* 167 Md.App. 483, 511 n. 12, 893 A.2d 1152, *cert. denied,* 393 Md. 245, 900 A.2d 751 (2006). Nevertheless, "although a clause of the United States Constitution and one in our own Declaration of Rights may be 'in pari materia,' . . . 'each provision is indepen-

---

In contrast to the Fourth Amendment, Article 26 does not expressly prohibit "unreasonable searches and seizures."

**9.** While serving on the Court of Appeals, Judge Irma S. Raker wrote a scholarly law review article addressing the question: "What is the Maryland rule with respect to the Fourth Amendment[,] Article 26, and the exclusion of illegally seized evidence?" Irma S. Raker, *Fourth Amendment and Independent State Grounds,* 77 Miss. L.J. 401, 413 (2007) (hereinafter, "Raker"). Judge Raker observed that "Maryland . . . continues to interpret Article 26 *in pari materia* with the United States Supreme Court's interpretation of the Fourth Amendment." *Id.* at 403. She added: "[A]t least as of today, Maryland continues to resolve search and seizure issues arising under Article 26 of the Maryland Declaration of Rights in accordance with the jurisprudence of the United States Supreme Court and its interpretation of the Fourth Amendment." *Id.* at 415.

dent. . . .' " *Gahan,* 290 Md. at 322, 430 A.2d 49 (quoting *Att'y Gen. v. Waldron,* 289 Md. 683, 714, 426 A.2d 929 (1981)). *See also Parker,* 402 Md. at 400, 936 A.2d 862; *Fitzgerald,* 384 Md. at 506, 864 A.2d 1006; *Davis,* 383 Md. at 408, 859 A.2d 1112; *State v. Suddith,* 379 Md. 425, 449–50 n. 3, 842 A.2d 716 (2004) (Eldridge, J., dissenting); *Liichow,* 288 Md. at 509 n. 1, 419 A.2d 1041.

Yet, despite the caveat of independence, the Court of Appeals has never held that Article 26 provides greater protection from State interference than its federal counterpart. Indeed, when presented with such arguments, Maryland courts have uniformly rejected them. *See, e.g., Scott,* 366 Md. at 143–45, 782 A.2d 862 (consent search initiated after "knock and talk" was legal under Article 26 as well as Fourth Amendment); *City of Annapolis v. United Food & Commercial Workers, Local 400,* 317 Md. 544, 566 n. 4, 565 A.2d 672 (1989) (Article 26 does not protect government employees from random, suspicionless drug testing to greater degree than Fourth Amendment); *Potts,* 300 Md. at 575–76, 479 A.2d 1335 (appropriate standard for reviewing magistrate's determination of probable cause to issue a warrant under Article 26 is the Fourth Amendment standard as articulated by the Supreme Court); *Gahan,* 290 Md. at 319–22, 430 A.2d 49 (neither Fourth Amendment nor Article 26 confers "automatic standing" to contest illegal seizure, where defendant did not have property or possessory interest in thing seized and therefore had no reasonable expectation of privacy); *Purnell,* 171 Md.App. at 603–607, 911 A.2d 867 (Article 26 did not bar policeman's search of passenger's unworn jacket during lawful search of vehicle pursuant to driver's arrest, where Fourth Amendment did not bar search); *Henderson v. State,* 89 Md.App. 19, 24, 597 A.2d 486 (1991) (under Fourth Amendment and Article 26, a fleeing suspect is not "seized" until actually apprehended); *Howell v. State,* 60 Md.App. 463, 467–68, 483 A.2d 780 (1984) (failure of warrant applicant to sign the warrant as provided by statute did not compel exclusion of evidence seized under either Fourth Amendment or Article 26).

As appellant recognizes, in the recent case of *Fitzgerald v. State, supra,* 384 Md. 484, 864 A.2d 1006, the Court of Appeals was presented with the opportunity to construe Article 26 more expansively than the Fourth Amendment. It did not do so, however.

In *Fitzgerald,* the Court was asked to determine the legality of a dog scan conducted at the door of an apartment whose occupants were under investigation for drug trafficking. *Id.* at 487–89, 864 A.2d 1006. The police had been informed by an anonymous source that the apartment's occupants sold marijuana, and had learned that one of the occupants had a juvenile record of arrests for distribution of the drug. *Id.* The police then came to the apartment building with a drug-sniffing dog, and entered the unlocked vestibule area of the building, which contained the doors to four apartments. *Id.* On repeated sweeps of the vestibule, the dog alerted to the presence of narcotics at the door of apartment "A," but not at the other three apartment doors. *Id.* The officers subsequently executed a search warrant for apartment "A" and seized substantial amounts of marijuana. *Id.*

On appeal of his resulting conviction for possession of marijuana with intent to distribute, Fitzgerald, one of the occupants, argued that the dog sniff of his apartment door was an unlawful search under both the Fourth Amendment and Article 26. *Id.* A divided Court of Appeals affirmed his conviction. The Court first reviewed the relevant Fourth Amendment jurisprudence and concluded: "The United States Supreme Court and this Court have held that canine sniffs are non-searches for Fourth Amendment purposes. As the canine sniff doctrine does not depend upon the sniff's location, we shall hold that a sniff of an apartment door from a common area is a permissible non-search under the Fourth Amendment." *Id.* at 487, 864 A.2d 1006.

The Court then proceeded to Fitzgerald's alternative claim, i.e., that a canine sniff is a search under Article 26 of the Maryland Declaration of Rights, *id.* at 506, 864 A.2d 1006, and that evidence obtained in violation of Article 26 should be

barred by an exclusionary rule. *Id.* at 507, 864 A.2d 1006. Mr. Fitzgerald noted that the Court had not addressed the question since *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), in which the Supreme Court held that the Fourth Amendment's exclusionary rule in incorporated against the States via the Due Process Clause of the Fourteenth Amendment. He argued that both the policy rationale of *Mapp* and, "perhaps most persuasive ... a trend approaching unanimity among the states to recognize exclusionary rules," weighed in favor of adoption of an exclusionary rule under Maryland law. *Fitzgerald,* 384 Md. at 507–508, 864 A.2d 1006.

The *Fitzgerald* Court declined to resolve whether the scan constituted an illegal search under Article 26. It reasoned, *id.* at 509, 864 A.2d 1006:

> There is no need to determine whether this is a case in which Article 26 mandates our finding an illegal search, while the Fourth Amendment mandates a conclusion that no search occurred. Similarly, this is not the case to revisit whether Article 26 contains an exclusionary rule, because even were we to adopt Fitzgerald's position, we would uphold the sniff's validity.... [T]he majority of state courts holding a dog sniff to be a search under their constitutions apply a reasonable suspicion standard. There was reasonable suspicion to support a sniff of Fitzgerald's apartment door.

The Court surveyed decisions from other states that held that their own state constitutions required reasonable, articulable suspicion before a dog sniff was conducted. *Id.* at 511 n. 14, 864 A.2d 1006. It concluded that, even if Article 26 "deems a dog sniff a search ... it would require only reasonable suspicion, which was present in this case." *Id.* at 512, 864 A.2d 1006.

Judge Greene dissented, joined by Chief Judge Bell. Judge Greene explicitly advocated a "break with the tradition of reading Article 26 of the Maryland Declaration of Rights *in*

*pari materia* with the Fourth Amendment." *Id.* at 520, 864 A.2d 1006. He commented, *id.* at 513, 864 A.2d 1006:

A far reaching consequence of today's holding is that those who reside in apartment buildings with gated or secured entrances will be afforded greater protections under the law than those who reside in apartment buildings that are left unsecured or open to the public. Moreover, this decision may ... result[ ] ... in random canine searches in targeted neighborhoods. *See United States v. Roby,* 122 F.3d 1120, 1127 (8th Cir.1997) (Heaney, J., dissenting) ("I do not believe that the Fourth Amendment protects only those persons who can afford to live in a single-family residence with no surrounding common space").

Judge Greene was not concerned with the intrusiveness of canine sniffs generally. Rather, his concern was infringement on "an individual's reasonable expectation of privacy in the home," and the "core value[ ][of] the right of the people to be secure in their homes from unreasonable government intrusion," *id.* at 519, 864 A.2d 1006, an issue not implicated here. On that basis, he argued for application of the heightened "probable cause" standard with respect to dog scans of a residence, rather than the reasonable suspicion standard applied, *arguendo,* by the majority. In the section of his opinion devoted to the Fourth Amendment analysis, Judge Greene reasoned, *id.* at 515, 864 A.2d 1006 (internal citations omitted) (emphasis added):

The majority focuses on the scope and nature of the "sniff" or "test" rather than the location in determining whether a legitimate privacy interest [exists]. The majority concludes that the only locational or circumstantial determination relevant to the inquiry is whether the dog was permitted outside the object sniffed. *I would have no quarrel with this analysis if the scope and nature of the "search" was an object, i.e., an automobile, piece of luggage, or the like used in transit.* My disagreement with the majority holding is that a random scanning of residences or people for the detection of contraband will lead to no protections for those who cannot afford to live in residences

with no surrounding common space and subject them to selective law enforcement.

Addressing the Court's decision not to reach Fitzgerald's Article 26 claim, Judge Greene stated: "In order to provide Maryland residents with greater protection against random canine sniffing searches, I believe we should reach the state constitutional question and declare canine sniffs *of dwellings* conducted on less than probable cause presumptively unreasonable. In addition, Maryland should adopt its own exclusionary rule." *Id.* at 518, 864 A.2d 1006 (emphasis added).

Appellant places great weight on the fact that the *Fitzgerald* Court stated that *if* Article 26 regulates dog scans more rigorously than does the Fourth Amendment, Article 26 would require reasonable suspicion to justify the scan. He argues that "a reading of the majority's decision in *Fitzgerald,* coupled with the dissent, fairly implies that Maryland is not against the judicial view that Article 26 . . . may provide more protection against unreasonable searches and seizures than the Fourth Amendment." Therefore, he urges us to take the step the *Fitzgerald* Court did not, and hold: (1) that Article 26 requires reasonable, articulable suspicion before any dog scan may be conducted; and (2) that Article 26 mandates the exclusion of evidence illegally obtained.

The State sees *Fitzgerald* in a different light. It underscores that "[t]he majority declined to reach the state constitutional question." Moreover, according to the State, Judge Greene rejected the reasonable suspicion test advocated by appellant. In its view, "the dissent in *Fitzgerald* took no issue with the proposition that a canine scan of a vehicle does not constitute a search."

▮ In our view, both appellant and the State read too much into the majority opinion in *Fitzgerald.* The fact that the *Fitzgerald* majority declined to decide whether Article 26 regulates dog scans more restrictively than the Fourth Amendment is of no moment. An opinion that explicitly declines to decide a question is not precedential authority on

either side of that question. Moreover, it is axiomatic that the dissent is not controlling precedent.

As to the dissent, the State's argument that Judge Greene explicitly rejected appellant's view is an overreading of the opinion. Judge Greene advocated for the more exacting probable cause standard for scans of *residences, id.* at 518, 864 A.2d 1006, and characterized application of the reasonable suspicion standard to dog scans of residences as "illogical and improper." *Id.* at 519, 864 A.2d 1006 (internal citation omitted). He stated: "If the canine sniff is a search, the Fourth Amendment applies requiring a warrant based on probable cause. If it is not a search, the Fourth Amendment is inapplicable." *Id.* But, the dissent was silent as to whether reasonable suspicion would be an appropriate standard for *dog scans of a vehicle under Article 26.*

As we indicated, the *Fitzgerald* majority left open the question of whether Article 26 requires reasonable suspicion for the conduct of any dog sniff. It did not reach the question because, in the Court's view, the search was supported by reasonable suspicion. Thus, *Fitzgerald* did not depart from the view that Article 26 is read *in pari materia* with the Fourth Amendment. Accordingly, there is no basis for us to conclude that Article 26 requires reasonable, articulable suspicion to uphold a drug dog's scan of a motor vehicle.

Even if we were to hold that the dog scan in the instant case violated Article 26, appellant's claim would fail. This is because no exclusionary rule exists for a violation of Article 26.

"In modern times, the phrase 'exclusionary rule' has come to mean a prohibition against use of evidence obtained through methods violative of the Constitution." Charles H. Whitebread & Christopher Slobogin, *Criminal Procedure* § 2.01, at 19 (5th ed.2008).[10] The source of the exclusionary rule in

---

**10.** Writing for this Court in *Sun Kin Chan v. State,* 78 Md.App. 287, 294–95, 552 A.2d 1351 (1989) Judge Moylan said:

*federal* proceedings with respect to evidence obtained in violation of the Fourth Amendment is *Weeks v. United States,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914). There, the Supreme Court determined that evidence seized "from the house of the accused by an official of the United States acting under color of his office in direct violation of the constitutional rights of the defendant" could not be used against the defendant at trial. *Id.* at 398, 34 S.Ct. 341. But, the *Weeks* Court explicitly declined to direct the suppression of other evidence seized by state officers, stating: "What remedies the defendant may have against them we need not inquire, as the Fourth Amendment is not directed to individual misconduct of such officials. Its limitations reach the Federal government and its agencies." *Id.*

It was not until *Wolf v. Colorado,* 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949), that the Supreme Court ruled that the Fourth Amendment's prohibition against unreasonable searches and seizures applied to the states. Although the *Wolf* Court determined that "[t]he security of one's privacy against arbitrary intrusion by the police—which is at the core of the Fourth Amendment—is ... implicit in 'the concept of ordered liberty' and as such enforceable against the States through the Due Process Clause" of the Fourteenth Amendment, *id.* at 27–28, 69 S.Ct. 1359, the Court declined to rule that "the basic right to protection against arbitrary intrusion by the police demands the exclusion of logically relevant evidence obtained by an unreasonable search and seizure...." *Id.* at 28, 69 S.Ct. 1359. Noting that many states maintained

---

There is, of course, no such thing as *the* Exclusionary Rule. There are many exclusionary rules, just as there are also many wrongs not redressed by the exclusion of evidence. There are Federal exclusionary rules and state exclusionary rules. There are judicially created exclusionary rules and legislatively created exclusionary rules. There are constitutional exclusionary rules and statutory exclusionary rules. There are broad exclusionary rules and ... highly particularized exclusionary rules available only for infractions of certain specified laws. There are exclusionary rules aimed only at governmental officials and exclusionary rules aimed at everybody. There are exclusionary rules applicable only in criminal trials upon the merits and exclusionary rules barring the use of evidence in any forum in any fashion.

both statutory and common law remedies against state officers who executed, procured, or issued warrants for illegal searches and seizures, *see id.* at 30–32 n. 1, 69 S.Ct. 1359, the Court said, *id.* at 30–31, 69 S.Ct. 1359:

> The jurisdictions which have rejected the *Weeks* doctrine have not left the right to privacy without other means of protection. . . . Granting that in practice the exclusion of evidence may be an effective way of deterring unreasonable searches, it is not for this Court to condemn as falling below the minimal standards assured by the Due Process Clause a State's reliance upon other methods which, if consistently enforced, would be equally effective.

Thus, until the Supreme Court decided *Mapp v. Ohio,* *supra,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081, in which it held that "all evidence obtained by searches and seizures in violation of the Constitution is, by that same authority, inadmissible in a state court," *id.* at 655, 81 S.Ct. 1684, the federal Fourth Amendment exclusionary rule was merely persuasive for state courts. In the period before *Mapp,* Maryland courts repeatedly rejected the notion of an exclusionary rule based on Article 26, instead adhering to the rule that "when evidence offered in a criminal trial is otherwise admissible, it will not be rejected because of the manner of its obtention. . . ." *Meisinger v. State,* 155 Md. 195, 199, 141 A. 536 (1928). *See also* ·*Lambert v. State,* 196 Md. 57, 62–64, 75 A.2d 327 (1950); *Marshall v. State,* 182 Md. 379, 383–84, 35 A.2d 115 (1943); *Lawrence v. State,* 103 Md. 17, 63 A. 96 (1906).[11]

In *Meisinger,* the first post-*Weeks* case in which the question of an exclusionary rule under State law was presented to

---

11. During the period from 1929 to 1973, Maryland had a limited, statutory exclusionary rule, known as the "Bouse Act." But, it did not apply in prosecutions for any felony or for certain serious misdemeanors. *See generally Howell, supra,* 60 Md.App. at 468 n. 2, 483 A.2d 780. As Judge Raker noted, the General Assembly enacted the Bouse Act "in direct response and in disagreement with the underlying policy expressed by the court in *Meisinger.*" Raker, 77 Miss. L.J. at 409. The Bouse Act was repealed after the Supreme Court's decision in *Mapp.* *See id.* at 410–11.

the Court of Appeals, the Court explicitly rejected the then-nascent federal exclusionary rule as a State constitutional requirement for evidence seized in violation of State law. In that case, the defendant was convicted of unlawfully possessing liquor with the intent to sell in Cecil County, which then barred such conduct. *Id.* at 195–96, 141 A. 536. The State conceded that "[t]he seizure of the liquor admitted in evidence was unlawful, there being no statute ... authorizing the issuance of a search warrant in cases of this character. The warrant should not have been issued, and the sheriff in serving the warrant was a trespasser." *Id.* at 199, 141 A. 536; *see also id.* at 196, 141 A. 536. Nevertheless, the Court upheld the use of the seized liquor as evidence against the defendant. The Court was mindful of the Supreme Court's decision in *Weeks, id.* at 197, 141 A. 536, but declined to adopt the *Weeks* doctrine, commenting, *id.* at 199, 141 A. 536:

> [I]n the trial of criminal cases, the admissibility of evidence is to be determined by its pertinency to the issue under consideration, and in cases like the one before us the court is not concerned with the collateral question of how such evidence may have been procured. The question of the guilt or innocence of the accused cannot be affected by its method of procurement, if the evidence offered is in itself germane and pertinent to the issue to be decided.

Thus, the Court reaffirmed its prior decisions, *id.*, including *Lawrence, supra,* 103 Md. 17, 63 A. 96, in which it said that "[t]he true effect of the constitutional provisions, here invoked against the admissibility of the evidence in question [is] that they are ... intended to prohibit legislation that may be oppressive to the citizen.... [T]hey have no application to the irregular and unlawful acts of individual[ ]" state officers, *id.* at 33, 63 A. 96, and therefore, " '[e]vidence which is pertinent to the issue is admissible although it may have been procured in an irregular or even an illegal manner.' " *Id.* at 36, 63 A. 96 (citation omitted). In reaffirming *Lawrence,* the *Meisinger* Court also noted that its view was "supported and fortified by the weight of authority elsewhere." *Meisinger,* 155 Md. at 199, 141 A. 536. In *Wolf,* the Supreme Court cited *Meisinger*

to place Maryland in the company of twenty-nine other states that, after *Weeks,* had evaluated "the admissibility of evidence obtained by unlawful search and seizure" and rejected the *Weeks* exclusionary rule as a matter of state law. *Wolf,* 338 U.S. at 29, 69 S.Ct. 1359. *See also id.* at 33–38, 63 A. 96 (appendix of tables surveying state cases on exclusionary rule).

In light of *Mapp's* holding that the Fourth Amendment's exclusionary rule applies to the states, *Lawrence, Meisinger,* and their progeny are now rarely of practical effect. But, they have never been overturned. To the contrary, the appellate courts of this State have continued to recognize them for the proposition that a violation of Article 26 does not give rise to an exclusionary rule under State law. *See Parker, supra,* 402 Md. at 394, 936 A.2d 862 ("This Court has not, since *Meisinger* . . . decided generally whether Maryland constitutional . . . law recognizes an exclusionary rule for evidence resulting from an illegal search and seizure."); *Chu v. Anne Arundel County,* 311 Md. 673, 537 A.2d 250 (1988); *Miller v. State,* 151 Md.App. 235, 246, 824 A.2d 1017, *cert. denied,* 377 Md. 113, 832 A.2d 205 (2003); *Howell,* 60 Md.App. at 468 n. 2, 483 A.2d 780. *See also* Raker, 77 Miss. L.J. at 408–411 (reviewing cases and statutory history, and concluding: "[T]oday, in Maryland, other than the federal exclusionary rule, the [C]ourt has not recognized an exclusionary rule for illegally seized evidence under Article 26.").[12]

---

**12.** The Court acknowledged in *Parker, supra,* 402 Md. at 399–406, 936 A.2d 862, that Maryland courts have, on occasion, recognized limited exclusionary principles on the basis of non-constitutional Maryland law. *See also id.* at 399, 936 A.2d 862 ("[U]nder the peculiar circumstances of this case, the evidence [derived from a 'no-knock' search warrant may be] excludable. . . . This is a very limited decision based *exclusively* upon Maryland non-constitutional law and procedure." (Emphasis in original)); *Davis, supra,* 383 Md. 394, 859 A.2d 1112; *Kostelec v. State,* 348 Md. 230, 703 A.2d 160 (1997); *Sheetz v. City of Baltimore,* 315 Md. 208, 553 A.2d 1281 (1989); *Chase v. State,* 309 Md. 224, 522 A.2d 1348 (1987); Raker, 77 Miss. L.J. at 411–14. *But see Parker,* 402 Md. at 411– 12, 936 A.2d 862 (Raker, J., dissenting) ("Unless this Court is prepared to state explicitly that the Court decides this case on Article 26 of the Maryland Declaration of Rights . . . the judgment of the Circuit Court

In our view, this case is governed by *Meisinger*, which dictates that there is no exclusionary rule for violations of Article 26. Because that decision has not been overruled, we are bound by it. *See, e.g., Runnels v. Newell,* 179 Md.App. 168, 944 A.2d 1183, slip op. at 25 (2008); *Johns Hopkins Hospital v. Correia,* 174 Md.App. 359, 382, 921 A.2d 837 (2007) ("[T]his Court does not have the option of disregarding Court of Appeals' decisions that have not been overruled, no matter how old the precedent may be."); *Hans v. Franklin Square Hosp.,* 29 Md.App. 329, 335, 347 A.2d 905 (1975), *overruled on other grounds by Brown v. Meda,* 74 Md.App. 331, 537 A.2d 635 (1988).

For these reasons, we shall affirm the denial of appellant's suppression motion.[13]

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**

---

[denying suppression] should be affirmed.... A case by case determination that results in exclusion of evidence, without a bright line rule to be applied, such as a state exclusionary rule as a part of Article 26, serves no deterrent purpose.").

Here, appellant has not made an argument for the extension of Maryland non-constitutional law. Rather, he has argued for suppression based solely on Article 26. Thus, we do not consider the question of whether Maryland non-constitutional law and procedure require suppression in this case.

**13.** Because we have determined that currently controlling precedent (a) does not provide a requirement under Article 26 of reasonable, articulable suspicion to support a drug dog scan of a motor vehicle, and (b) dictates that Article 26 does not require the exclusion of evidence illegally obtained, we need not determine whether the facts before us gave rise to reasonable, articulable suspicion.