968 A.2d 654

**Theodore DORSEY**

v.

**STATE of Maryland.**

**No. 2993, Sept. Term, 2007.**

Court of Special Appeals of Maryland.

March 30, 2009.

---

86

Booth Marcus Ripke (Larry Allen Nathans, Nathans & Biddle, LLP, on the brief), Baltimore, for Appellant.

Sara Page Pritzlaff (Douglas F. Gansler, Atty. Gen., on the brief), Baltimore, for Appellee.

Panel: DAVIS, HOLLANDER, MELANIE M. SHAW-GETER (Specially assigned), JJ.

HOLLANDER, Judge.

Following a trial in September 2007, a jury sitting in the Circuit Court for Frederick County convicted Theodore Randolph Dorsey, appellant, of second degree arson, in violation of Maryland Code (2002, 2006 Supp.), § 6–103 of the Criminal Law Article ("C.L."). The conviction arose from an automobile fire that occurred on September 2, 2006, involving a vehicle that belonged to appellant's girlfriend, Elizabeth Anderson.[1]

On appeal, appellant focuses on two issues: the jury deliberations, which were the subject of his unsuccessful motion for new trial, and the admission of his medical records. Dorsey asks:

1. Whether a new trial should be ordered because jurors disobeyed explicit jury instructions and discussed the defendant's refusal to testify in his own defense[.]

2. Whether the lower court erred by admitting into evidence Mr. Dorsey's confidential medical records when the State obtained these records in violation of both Maryland's Confidential Medical Records Act, and Mr. Dorsey's constitutional privacy rights[.]

---

1. The court sentenced appellant to three years' imprisonment, which it suspended in favor of two years' probation, the first six months of which were to be served in home detention.

For the reasons set forth below, we shall affirm the judgment of conviction.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

■ In September 2006, Dorsey was a deputy sheriff who had been employed for fifteen years in the Frederick County Sheriff's Office; Anderson was a police officer in the Brunswick Police Department. They met for dinner on September 2, 2006, at a restaurant in Frederick. After dinner, Anderson left her car at the restaurant, because she had been drinking; appellant drove her home. Late that night, Anderson's car was set afire, at a location approximately six to ten minutes from the restaurant. State Deputy Fire Marshal K. Arthur McGhee determined that the fire was an arson. No fingerprints, footprints, tire tracks, gasoline cans, or other physical evidence linked appellant to the scene.

At trial, McGhee testified as an expert in the cause of fires and fire investigation. Moreover, he testified that he has been an emergency medical technician since 1981, and had seen burn injuries on "[t]oo many [occasions] to count." McGhee questioned appellant about the fire on September 5, 2006. Appellant told McGhee that, after he dropped off Anderson, he went to several bars in Harrisburg with a friend, Dale Williams, and got into a fight. During the altercation, Dorsey "got hit in the face with a bottle." He explained that the bottle "broke [and] cut his face."

McGhee recalled that, at the time of questioning, appellant had "four inch by four inch medical gauze taped to the [left] side of his face and his left hand and wrist area [were] covered in gauze." He stated:

---

2. In view of the issues presented, we need not include a detailed summary of the evidence adduced at trial. Instead, we shall include "only the portions of the trial evidence necessary to provide a context for our discussion...." *Washington v. State*, 180 Md.App. 458, 461 n. 2, 951 A.2d 885 (2008); *see Singfield v. State*, 172 Md.App. 168, 170, 913 A.2d 671 (2006), *cert. denied*, 398 Md. 316, 920 A.2d 1060 (2007); *Martin v. State*, 165 Md.App. 189, 193, 885 A.2d 339 (2005), *cert. denied*, 391 Md. 115, 892 A.2d 478 (2006).

While [appellant] was filling out the statement and was talking to me, he was sitting on my left at a, just like a dining room table and he was filling out the form and he would have to reach up and try to put—this bandage kept, as he was talking would—it wasn't put on very well. It was kind of taped on and it kept trying to come off his face and it would stick and he'd put it back. And then I noticed it was a like red and there was, I could see what looked like skin, um, that had, like the first layer of the epidermis had started to come off. It looked like skin hanging. I, I wasn't exactly sure, but that's what it looked like. And then I noticed on the gauze that he had on his hand, it didn't cover every inch of his hand. I mean I could see the web area between his thumb and his finger, his index finger on his left hand, the, the epidermis, the skin was coming off, which looked like a burn.

The colloquy continued:

[PROSECUTOR]: Okay. And the, let's first start, again, the hand injury you believe was a burn? Is that correct?

[MCGHEE]: Yes.

[PROSECUTOR]: And how about the injury to his face?

[MCGHEE]: It looked like it might have been a burn also.

* * *

[PROSECUTOR]: Okay. Have you had occasion to see cutting wounds before?

[MCGHEE]: Yes.

[PROSECUTOR]: Okay. Did these appear, did the, the wound on his face, did that appear to be a cutting wound to you?

[MCGHEE]: No.

[PROSECUTOR]: Did it appear to be consistent with something, with being struck with something sharp like a bottle?

[MCGHEE]: No.

The court received into evidence photographs of the injuries to appellant's face and hands, which were taken on September 15, 2006. Under one of the photographs, McGhee had written: "Suspect'e [sic] right hand (apperars [sic] to be a burn injury)." Under another he wrote: "Suspect's injury to left hand (apperars [sic] to be burn injury)."

Dale Williams testified that he saw appellant on the morning of September 2, 2006, around noon on September 3, 2006, and at some point after September 3, 2006. Williams recalled that appellant had no injuries on September 2, 2006. But, on September 3, 2006, Williams "saw bandages" on appellant's "face and hands." He described appellant's skin as "kind of pinkish."

John Allen Turner, a constable with the Frederick County Sheriff's Office who had known appellant for about seven years, testified that he saw appellant at Advanced Urgent Care in Frederick on September 8, 2006. The following is relevant:

[PROSECUTOR]: ... Did you speak with Mr. Dorsey that day?

[TURNER]: Ah, yes. I spoke to him for about three to five minutes, which he was there filling out paperwork. I noticed that he was coming out of the door and, you know, I had to do a double-take and ..., you know, I was concerned. I was like man, what happened to you?

[PROSECUTOR]: Why'd you say that?

[TURNER]: Well, he had what appeared to be, was like pink, more or less burns or spots on his face.... And then his hand was wrapped and his wrist on his left.

[PROSECUTOR]: Were you able to see the injuries to his hands or were they all wrapped up?

[TURNER]: No, they were wrapped.

Turner added that, when he asked appellant what happened, appellant stated "that he got in a fight with a grill and that was it."

On cross-examination, Turner agreed that in his written statement he said he "noticed what appeared to be burns." On redirect examination, the prosecutor asked Turner about "any further comment [he made] as to the injuries to Mr. Dorsey." The following ensued:

[PROSECUTOR]: What'd you say?

[TURNER]: ... I was just concerned for his welfare and since they appeared to be burns and what, I believe that they were burns. I've seen burns and they looked like burns, so that's ...

[PROSECUTOR]: And specifically, what did you see that ... led you to that conclusion—

[TURNER]: ... [W]hen the skin was pink and on, on his face and then when his, ah, arm was bandaged up, you know, that's why I thought that they were burns. They appeared to be and therefore I thought they were and then after we had our little discussion about being in a fight wth [sic] a grill I was like okay, then they were.

[PROSECUTOR]: Did, did you make any comment as to whether skin was missing from Mr. Dorsey?

\* \* \*

[TURNER]: I noticed that skin was missing ... and his skin was pink in color. That's correct—

The State sought to offer appellant's medical records from Advanced Urgent Care, dated September 8, 2006.[3] Defense counsel objected, and the court heard argument regarding the admissibility of the evidence, outside the presence of the jury. Defense counsel argued:

[W]hat we really have is evidence that should never have gotten into the prosecution's hands in the first place if it wasn't properly subpoenaed and Urgent Care released it

---

**3.** Advanced Urgent Care produced the records in response to a pretrial subpoena issued by the Fire Marshal, who then disclosed the records to the prosecutor. Appellant learned of them during discovery. This matter is discussed in more detail, *infra.*

without the consent of Mr. Dorsey then he can't testify to it and that's why I'm going to move to preclude him from being able to do so.

Moreover, defense counsel insisted that the State had to prove that it had written procedures in place when it issued the subpoena. Relying on the Maryland Confidentiality of Medical Records Act (the "Act"), Md.Code (2005 Repl.Vol., 2007 Supp.), § 4–301 to 4–309 of the Health–General Article ("H.G."), he asserted: "[T]he plain reading of the statute would require that before you enter those medical records [the State] has to produce written guidelines of [the] office's procedures and unless that's met I don't think that that comes in." As to compliance with the Health Insurance Portability and Accountability Act, Pub. Law 104–191, 110 Stat.1936 (1996) ("HIPAA"), defense counsel argued: "HIPAA is, is a quagmire of information to try to, to figure out how to comply with it...." But, he maintained that "the whole purpose of that reform was to enhance the confidentiality of medical records...."

The State countered that, under H.G. § 4–306, appellant's authorization was not required for disclosure. The prosecutor also claimed that the subpoena was issued pursuant to § 6–310 of the Public Safety Article. See Md.Code (2005, 2007 Supp.), § 6–310 of the Public Safety Article ("P.S.").

The court ruled:

[I]t's clear and there are sections under HIPAA that make it clear that the purpose is to protect confidentiality of patients but is not to prevent disclosure as otherwise authorized by law. So I'm not going to focus on HIPAA.... The records have been disclosed. The records were disclosed by the health care provider pursuant to a subpoena issued under the Public Safety [Article]. The subpoena itself under the Public Safety [Article] did not have the required language under Health General. However, despite that the information came into the possession of the State. It is a, an area where they are, the health care provider is authorized to disclose the records without the permission or

without notice to the record-holder.... The only reported case deals with the impropriety of the Court ordering disclosure of the records without the written requirements of the confidentiality but that is disclosure for investigatory purposes for whatever reason or without any other, there's no evidence that there was compliance with the second section of, um, [H.G. 4–]306(b)(7) or not. I'm going to overrule the objection and allow the witness to testify with the authentication of the record.

Ronald Golden, office manager and radiologic technician at Advanced Urgent Care, was called to authenticate the record, and appellant requested "a brief voir dire." When appellant asked Golden if he had "written procedures for dealing with the release of medical information of patients," the State objected that it had "been ruled upon." Appellant said that he would "discontinue that line of questioning at this point" and "[r]est on [his] prior objection." The court again overruled the objection.

Appellant's medical records, dated September 8, 2006, were admitted. They provide:

HISTORY OF PRESENT ILLNESS (PHYSICIAN): L side of face and L hand were burned 6 days ago when his gas grill ignited with a fireball. He has been using Zim's wound cream on his face and blister pads on his hand. The burn on his face is looking much improved. His hand has several open wounds and one large deflated blister. Denies purulent drainage. No fever or malaise.

INSPECTION: Skin on L side of face/nose healing well. No edema, erythema, drainage. Intact blisters on dorsal fingers of L hand. Large, deflated blister on dorsal hand. Several small areas of missing epidermis. No purulent d/c. Burn on hand is not circumferential.

During the State's case, the defense entered photographs that McGhee took of the vehicle during his investigation. At the close of the State's case, defense counsel moved for a judgment of acquittal, arguing that "none of the elements were, were made out on a prima facie case even looking at it

... in the light most favorable to the State." Specifically, he contended that there was no proof of malice, and "the willfulness is ... not 100 percent clear." The State countered that "there is certainly enough circumstantial evidence to, ah, for any reasonable jury certainly at this stage to find Mr. Dorsey guilty. I think the plain reading of the statute as well as the jury instruction gives maliciously a definition that frankly we've met in this case." The court denied the motion, stating: "[P]ursuant to the language of the jury instruction with the new second degree arson ... there is sufficient evidence to go to the jury...."

Appellant did not testify or call any witnesses. The court instructed the jury, in part: "The Defendant has an absolute constitutional right not to testify. The fact that the Defendant did not testify must not be held against the Defendant. It must not be ... even considered by you in any way or even discussed by you during your deliberations."

In its closing, the State quoted almost verbatim from the medical records. Appellant's attorney argued:

Let me talk for a minute before I go into the rest of my case about [appellant] not testifying. I know that the jury instruction says that you're not even to discuss it. I know that it's not to be held against him. But I also know that's a little bit against human nature and I ask you that if it comes up, I forgive you. [If] [i]t happens to come up in deliberations put it on me, not on [appellant].

After the jury returned a guilty verdict, appellant moved for a new trial. He alleged, *inter alia,* that the medical records were inadmissible, and that the jury engaged in misconduct because it considered appellant's failure to testify. Regarding the alleged jury misconduct, appellant asserted:

After the jury was polled and allowed to leave the courtroom, this Honorable Court indicated it would speak to the jurors. Counsel waited in the hallway until the jurors left and asked to speak with them. One juror spoke with Counsel and indicated that despite the Court's instruction, the jury wanted to hear from the Defendant and that this fact was a dispositive one.

At a motion hearing on January 16, 2008, appellant's counsel proffered the information he had obtained about the jurors' deliberations.[4] He argued that Md. Rule 5–606(b)[5] did not preclude the court from hearing testimony from an investigator about jury misconduct. He also insisted that the medical records were inadmissible because there was no proof of a written policy guarding their confidentiality. The following excerpts from counsel's argument are pertinent:

> The most troubling part of this case, Your Honor, I have to say occurred when I talked to one of the jurors afterwards and she was kind enough to speak with me and indicated that there was some discussion about the fact that [appellant] didn't testify. . . . And Ms. Lynn was the only juror who, ah, who took the time to speak to me and, and told me about that. So what we did was, as I provided the materials to you in chambers, was have Mr. Chase, an investigator, go out and see which jurors would care to speak to us and I was very, very careful to let him know, you know, not to pressure anybody and let them know if they don't want to talk then he just walks and he did. And he did on many of them that they just simply didn't want to talk to him. But several of the jurors that sat in this case, ah, gave him clear indication that they disregarded your instruction.

> \* \* \*

> . . . [M]ultiple folks did, ah, did admit that there was a discussion about it. . . .

> \* \* \*

> . . . What they said, several of them in, in Mr. Chase's report is they felt it didn't influence the case but that they admitted that it was discussed. Only one juror out of the folks that talked about it indicated that he did not overhear

---

4. The materials were not marked for identification and are not included in the record.

5. The text of Md. Rule 5–606(b) appears in the Discussion, *infra*.

anyone talking about the, ah, the fact that [appellant] didn't testify.

In denying the motion, the court said:

I read [Rule] 5–606 as being an absolute prohibition for the Court inquiring into what mental processes juries go through in the jury room. The *Jenkins* case [375 Md. 284, 825 A.2d 1008 (2003)] where you have a witness talking to a juror at lunch is different than you're talking about what the jurors are talking about in the jury room and I read 8–606(b)(2)(sic) as to a real question whether I can even consider the statements made to the investigator for the purpose of determining whether they properly or improperly applied my instructions because I read that as being an inquiry into the validity of the verdict. *Jenkins* is factually very different. You're not talking about what the jury was doing in the jury deliberation room to the, as most essential processes that a jury does, which is deliberate on the evidence in the case. The case where they put the alternates in in Baltimore City is different. The case in *Jenkins* where you're talking about a witness interviewing a, having lunch with a juror is different because you're not talking about what the juries are doing inside the jury room. I think 5–606 is very clear that the statements made to [defense counsel] . . . and to any investigator, I can't consider for the purpose of inquiring into the verdict as to a matter or a statement that occurred during the course of their deliberation. So I don't think I have, ah, I can consider it under 5–606 as a way to inquire in to set aside the verdict on that ground. So I'm denying the motion for new trial on that ground.

The court also rejected the challenge to the admission of the medical records. It said: "I've ruled on that already and I don't see any reason to, for me to reverse my finding."

## DISCUSSION

### I.

Maryland Rule 5–606(b) is at the center of the dispute pertaining to the jury verdict. It provides:

**Rule 5–606. Competency of juror as witness.**

\* \* \*

(b) **Inquiry into validity of verdict.** (1) In any inquiry into the validity of a verdict, a sworn juror may not testify as to (A) any matter or statement occurring during the course of the jury's deliberations, (B) the effect of anything upon that or any other sworn juror's mind or emotions as influencing the sworn juror to assent or dissent from the verdict, or (C) the sworn juror's mental processes in connection with the verdict.

(2) A sworn juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying may not be received for these purposes.

(3) Notes made under Rule 2–521(a) or Rule 4–326(a) may not be used to impeach a verdict.

Appellant contends that the trial court "erred" or "abused its discretion" in denying his motion for a new trial, which was premised on his claim that the "jurors disobeyed" the court's "explicit instructions" by "openly discussing Mr. Dorsey's failure to testify in his own defense." In his view, such conduct "compromised the integrity of the proceedings" and deprived him of "a fair trial."

Dorsey concedes that "Rule 5–606 upholds the general pre-Rule principal [sic] that jurors cannot be called upon to impeach their verdict. . . ." But, he claims that the trial court misinterpreted Md. Rule 5–606(b) as an absolute bar to the consideration of evidence as to jury misconduct. In Dorsey's view, the trial court's narrow interpretation of the Rule "simply does not make sense," because it would mean that no verdict could be set aside "if doing so required using any type of evidence involving jurors after they retired to the jury room." He adds: "From a policy perspective, the lower court's interpretation of Md. Rule 5–606 is unreasonable because it leaves courts with no recourse in the face of compel-

ling evidence that jurors violated fundamental fairness by discussing a defendant's refusal to testify in his own defense."

Moreover, Dorsey argues that the circuit court's "reading of Maryland Rule 5–606 is erroneous because it effectively strikes this entire first clause of 5–606(b)(1) by reading it out of the rule." In his view, the trial court's "interpretation also renders the entire heading to section (b) of the Rule meaningless."

In addition, appellant complains that the court did not recognize "the difference between an 'inquiry into the validity of a verdict,' and the inquiry Mr. Dorsey actually requested: an inquiry into whether there was a systemic breakdown before the verdict, because an extraneous and inherently prejudicial matter was placed before the jury." He maintains that Rule 5–606(b) permitted the court to consider evidence that the jurors discussed appellant's silence, "because the jurors['] comments had nothing to do with the verdict." Dorsey explains: "As long as the court's inquiry was limited to whether jurors broke the rule [of not discussing appellant's silence], the focus remained on 'the integrity of the process,' and it was not even relevant whether the error affected the verdict or not." Dorsey insists that "the constitutional interests in a fair trial can be vindicated without even implicating the policy against asking jurors to impeach their verdict because the violation is unrelated to the verdict. An error of constitutional magnitude can be established—or ruled out—based solely on whether the rule was broken."

Further, Dorsey contends that the jury's conduct was presumptively prejudicial because it went "to the very heart of constitutional fairness in any criminal proceeding." Claiming that the court failed to balance "the constitutional rights at stake," appellant posits: "This case presents a perfect storm that implicates one of the most core constitutional principals [sic] that exists in criminal proceedings, and one that commands additional vigilance because of the predisposition to assume the worst from a silent defendant."

The State responds that "[b]oth the language of Rule 5–606(b) and case law fully support the trial court's refusal to consider the jurors's [sic] comments to Dorsey's attorney and the investigator, as well as the trial court's ruling." In its view, appellant's "logic" is "flawed" because his efforts to prove that he was denied a fair trial "necessarily involve[ ] an inquiry into how the verdict was reached" as well as the "validity of the verdict." It argues: "[I]f Dorsey were allowed to present evidence that the jurors talked about Dorsey's failure to testify, but the discussion had 'nothing to do with the verdict,' then his claim that he was denied a fair trial, and thus is entitled to a new trial, must fail." Pointing to the fallacy in appellant's argument, the State asserts: "The reality is that Dorsey *does* want to impeach the verdict, and get a new trial, by showing that the jurors disobeyed the court's instructions."

Furthermore, the State maintains that "Rule 5–606 exists, in part, to prevent exactly what happened in this case." While recognizing that the rule permits "an inquiry into the validity of the verdict using other evidence," the State argues: "The trial court was correct in finding that Rule 5–606(b) precluded considering ... evidence [that] involved the deliberations and mental processes of the jurors in reaching their verdict." Alternatively, the State maintains that, even if the trial court could have considered appellant's proffer, appellant did not offer sufficient proof of prejudice.

In reply, appellant reiterates that "no juror was asked to impeach their verdict, nor was any juror asked to take the witness stand." Instead, appellant offered third-party testimony that the court should have considered as "other" evidence. Dorsey asserts:

> In essence, this Court is confronted with two interpretations of Rule 5–606(b). We respectfully submit that [appellant's] interpretation ... makes more sense. It would allow a third party to testify post-verdict about something jurors report occurring during deliberations, as long as the inquiry is limited to determining whether there was a systemic breakdown relating to the constitutional fairness of the proceeding, and the inquiry does not require jurors to

comment on the validity of the verdict. This interpretation does a better job of balancing the important public policy interests at stake against the constitutional right to a fair trial. It does not violate cannons of interpretation by rendering an important clause in the Rule meaningless. Most importantly, if a juror later confesses to a third party that during deliberations there were discussions of explicitly forbidden topics that could undermine the integrity of the entire process, some limited inquiry can proceed.[ ]

██ In construing Rule 5–606, quoted earlier, we apply the same canons and principles that apply to the construction of statutes. *See Knox v. State*, 404 Md. 76, 85, 945 A.2d 638 (2008); *State v. Williams*, 392 Md. 194, 206, 896 A.2d 973 (2006). Therefore, we look first to the words of the rule. *Knox*, 404 Md. at 85, 945 A.2d 638. Chief Judge Bell explained for the Court in *Brown & Williamson Tobacco Corp. v. Gress*, 378 Md. 667, 676, 838 A.2d 362 (2003):

"When the words [of the rule] are clear and unambiguous, ordinarily we need not go any further. Only when the language of the rule is ambiguous is it necessary that we look elsewhere to ascertain legislative intent. We are also to give effect to the entire rule, neither adding, nor deleting, words in order to give it a meaning not otherwise evident by the words actually used. Finally, we seek to give the rule a reasonable interpretation, not one that is illogical or incompatible with common sense."

(Quoting *New Jersey v. Strazzella*, 331 Md. 270, 275, 627 A.2d 1055 (1993)) (internal citations omitted).

In our view, the trial judge correctly interpreted Rule 5–606. We explain.

██ "The well-settled Maryland rule is that jurors cannot be heard to impeach their verdict." *Colvin-el v. State*, 332 Md. 144, 184, 630 A.2d 725 (1993), *cert. denied*, 512 U.S. 1227, 114 S.Ct. 2725, 129 L.Ed.2d 849 (1994). Indeed, jurors' discussions are "sacrosanct." *John Crane, Inc. v. Puller*, 169 Md.App. 1, 53, 899 A.2d 879 ("In our system of justice, the jury is sacrosanct and its importance is unquestioned.") (cita-

tions and quotation marks omitted), *cert. denied,* 394 Md. 479, 906 A.2d 943 (2006). In *Stokes v. State,* 379 Md. 618, 638, 843 A.2d 64 (2004), the Court observed:

> Jury deliberations are private and are to be conducted in secret. The rule prohibiting verdict impeachment is stringent and of long standing; one reason for the rule is to protect the secrecy of jury deliberations. It has been said that while privacy is not a constitutional end in itself, it is the means of ensuring the integrity of the jury trial itself. (Internal citations omitted.)

*See also Clark v. United States,* 289 U.S. 1, 13, 53 S.Ct. 465, 77 L.Ed. 993 (1933) ("Freedom of debate might be stifled and independence of thought checked if jurors were made to feel that their arguments and ballots were to be freely published to the world. The force of these considerations is not to be gainsaid.").

Maryland Rule 5–606(b) "codifies Maryland's strict common law juror nonimpeachment rule." LYNN McLAIN, MARYLAND RULES OF EVIDENCE, Rule 5–606, at 110 (2007) ("McLain"). It was adopted by the Court, effective July 1, 1994.[6] But, the

---

6. The rule is patterned after Fed.R.Evid. 606(b), but is not identical to it. The federal rule states, in part:

**Rule 606. Competency of Juror as Witness**
\* \* \*

(b) Inquiry into validity of verdict or indictment. Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention, or whether any outside influence was improperly brought to bear upon any juror. Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

Notably, the Court of Appeals rejected that part of the federal rule that permits a juror to testify about whether extraneous prejudicial information or outside influence was improperly brought to bear upon the juror. McLain, Rule 5–606, at 110; 125th Report of the Court of Appeals Standing Committee on Rule of Practice and Procedure, *Pro-*

veil surrounding jury deliberations predates the adoption of the rule. *See Jenkins v. State,* 375 Md. 284, 331–32, 825 A.2d 1008 (2003). About forty years before the Rule was enacted, the Court of Appeals observed in *Williams v. State,* 204 Md. 55, 67, 102 A.2d 714 (1954):

> The law in Maryland is well settled that a juror cannot be heard to impeach his verdict, whether the jury conduct objected to be misbehavior or mistake. *Browne v. Browne,* 22 Md. 103, 113 [ (1864) ]. The reasons for the rule have been stated by this Court in *Brinsfield v. Howeth,* 110 Md. 520, 530[, 73 A. 289] [ (1909) ], in these impressive words: "Such evidence is forbidden by public policy, since it would disclose the secrets of the jury room and afford an opportunity for fraud and perjury. It would open such a door for tampering with weak and indiscreet men that it' would render all verdicts insecure; and, therefore, the law has wisely guarded against all such testimony and has considered it unworthy of notice. It would be a most pernicious practice, and in its consequences dangerous to this much valued mode of trial, to permit a verdict, openly and solemnly declared in the Court, to be subverted by going behind it and inquiring into the secrets of the jury room."

> Other risks sought to be averted, it has been said, are harassment of jurors by disgruntled losing parties; removal of an element of finality from judicial decisions; and through allowing jurors to swear to alleged examples of reprehensible conduct, a decrease in public confidence in the judicial process.

*See also Harford Sands, Inc. v. Groft,* 320 Md. 136, 145, 577 A.2d 7 (1990).

*Williams,* 204 Md. 55, 102 A.2d 714, provides guidance. In that case, an African–American defendant convicted of assault and battery moved for a new trial, alleging that racial prejudice influenced the jury. *Id.* at 58, 65, 102 A.2d 714. She

---

*posed Title 5 of the Maryland Rules of Procedure: Evidence* 62 (July 1993) (indicating that, as originally proposed, the Maryland Rule would have tracked the federal rule exactly).

supported her motion with a juror's post-trial affidavit, which said, *id.* at 65–66, 102 A.2d 714 (quoting affidavit):

> "This was an all white jury. From the beginning of the discussion in the jury room it was the race of the defendant, not the facts, which were weighed by the majority of the jurors. They freely discussed the race of this girl and said that where colored people are concerned the police have got to be right. Bandied back and forth between the jurors were the statements that these colored people are smart alecs, especially the educated ones; that they overassert their rights; that we must teach them a lesson. Four of the jurors, including myself, were for complete acquittal at the first of the discussion. A fifth juror was undecided. The other jurors kept hammering at us. One of the jurywomen exclaimed to me, 'You're taking that colored girl's word against the police. You must be in trouble with the police!' I told her I had never been in trouble with the police, that I had many friends who were police officers, but I felt this girl was innocent. The last half hour, I held out alone. I finally threw in the towel when some of the jurors accused me of being a 'nigger-lover.' "

After the trial court denied the motion, the defendant appealed. *Id.* at 58, 66, 102 A.2d 714. In affirming the conviction, the Court of Appeals concluded that the affidavit should not have been considered because "[t]he law in Maryland is well settled that a juror cannot be heard to impeach his verdict," *id.* at 67, 102 A.2d 714, and the Court could not "ignore the rules as to the manner in which claimed prejudice may be shown . . . ." *Id.* at 72, 102 A.2d 714. Further, it declared: "[T]he affidavit of a juror is inadmissible as evidence at the hearing on the motion for a new trial . . . ." *Id.* And, said the Court: "We have been referred to no case, and careful independent research has disclosed none, where a verdict was set aside on appeal in any jurisdiction, because of fallacious, unfair or biased arguments advanced by jurors to one another in their deliberations." *Id.* at 70, 102 A.2d 714. The Court remarked that it reached this conclusion even though the "claim that a litigant has been denied justice on

account of his or her race ... rais[es] an issue of utmost gravity." *Id.* at 72, 102 A.2d 714.

As we indicated, appellant argues that a presumption of prejudice arose in his case based on the evidence of the jurors' discussion of appellant's silence. But, prejudice is only presumed in circumstances concerning an outside influence. *Compare Remmer v. United States*, 347 U.S. 227, 229, 74 S.Ct. 450, 98 L.Ed. 654 (1954) (outside influence is "presumptively prejudicial") and *Stokes, supra,* 379 Md. at 631, 638, 843 A.2d 64 (presuming prejudice based on the presence of alternate jurors in the jury room) *with Summers v. State,* 152 Md.App. 362, 379, 831 A.2d 1134 (no presumption of prejudice when discussion occurs among jurors), *cert. denied,* 378 Md. 619, 837 A.2d 929 (2003).

*Jenkins, supra,* 375 Md. 284, 825 A.2d 1008, is illustrative. There the defendant was charged with second degree murder and other crimes. *Id.* at 287, 825 A.2d 1008. The detective who interviewed the State's key witness testified for the State at Jenkins's trial. *Id.* at 290–91, 825 A.2d 1008. Her interview notes "were read into the record as evidence." *Id.* at 291, 825 A.2d 1008. Five days after the jury's guilty verdict, the detective ran into Jenkins's counsel and told the attorney that she had had contact with a juror during the course of the trial. *Id.* at 291–92, 825 A.2d 1008.

Jenkins then moved for a new trial, alleging "improper contact between a juror and a detective," which prejudiced Jenkins. *Id.* at 287–88, 825 A.2d 1008. At an emergency motion hearing, the detective and the juror testified about what the Court characterized as their "extensive contact" with each other at a weekend religious retreat, held while the trial was still in progress. *Id.* at 292, 825 A.2d 1008. The juror testified that he initially tried to avoid the detective but then approached her and told her he could not talk to her. *Id.* The detective, apparently thinking he was a juror on a different case, asked if the jury found the defendant guilty. *Id.* at 292–93, 825 A.2d 1008. According to the juror, he "told her that the trial remained in progress," but the two did not

discuss the case further. *Id.* at 293–94, 825 A.2d 1008. However, they sat together at a seminar, had lunch alone, and the detective drove the juror to his car at the end of the retreat. *Id.* at 294, 825 A.2d 1008. The detective gave similar testimony. *Id.* at 294–95, 825 A.2d 1008.

The trial court found the contact improper but denied the motion, concluding that it did not prejudice Jenkins. *Id.* at 288, 825 A.2d 1008. The Court of Appeals reversed, *id.* at 341, 825 A.2d 1008, ruling that "denial of [Jenkins's] motion for a new trial was a clear abuse of discretion under the specific egregious circumstances in the case *sub judice* ...." *Id.* at 289, 825 A.2d 1008. It elaborated, *id.* at 289, 825 A.2d 1008:

> Regardless of whether details of the ongoing trial were discussed, personal and prolonged contact as occurred in this case ... interjects an inherent prejudice to [Jenkins] in the form of possible bias in favor of the State's case, [and] creates an appearance of serious impropriety and causes subsequent serious harm to the perception of the integrity of the jury process itself.

The Court noted that "the strong possibility of prejudice ... invokes the presumption" of prejudice that "the State must effectively rebut...." *Id.* at 329, 825 A.2d 1008. Yet, the State's "only method of affirmatively rebutting" the presumption would be by asking the juror how his contact with the detective affected his ability to decide the case. *Id.* at 329–30, 825 A.2d 1008. The Court concluded that Rule 5–606(b) precluded such an inquiry. *Id.* at 331, 825 A.2d 1008.

In contrast, in *Summers,* 152 Md.App. at 378, 831 A.2d 1134, this Court did not presume prejudice based on juror misconduct involving two jurors who discussed the case at lunch, outside the presence of the other jurors. We observed, *id.* at 379, 831 A.2d 1134 (internal citation omitted):

> This case differs from all of these cases we have discussed [about improper communications] because the allegedly improper communication here occurred between two jurors, not between a juror and a witness, defendant, or third party. We find that distinction significant. Third party

communication with a juror raises a concern that the juror may reach a verdict on the basis of the improper extrinsic communication rather than the evidence. That concern is greatly diminished when, as in this case, the improper extrinsic communication occurred solely between two jurors.

■ To be sure, the rule does not bar all inquiries with respect to a jury verdict. With regard to permissible inquiries, *Smith v. Pearre,* 96 Md.App. 376, 625 A.2d 349, *cert. denied,* 332 Md. 454, 632 A.2d 151 (1993), a medical malpractice action, is noteworthy. In that case, the trial court admonished the jury not to read the newspaper or watch the news on television, so as to avoid hearing " 'anything about this case or medicine in general or anything about civil suits.' " *Id.* at 389, 625 A.2d 349 (quoting trial court). After the jury delivered its verdict for the defendants, plaintiffs' counsel learned of a relevant "60 Minutes" program that aired while the trial was in progress. *Id.* at 389–90, 625 A.2d 349. Therefore, he "engaged the services of an investigator to conduct a telephone survey of the jurors." *Id.* at 390, 625 A.2d 349. After the investigator determined that the jury foreman watched the program, plaintiffs moved for a new trial, alleging juror misconduct. *Id.* at 389–90, 625 A.2d 349. The circuit court denied the motion and this Court affirmed. *Id.* at 379–80, 625 A.2d 349.

In our analysis, we addressed whether evidence that the jury foreman watched the program could "be properly considered by the trial court." *Id.* at 390, 625 A.2d 349. The Court reasoned that such evidence "constitute[d] extraneous material that occurred outside the sanctity of the jury room," and therefore the trial court could consider it. *Id.* We distinguished such information from "what occurred during jury deliberations," which the court could not consider. *Id.* The Court observed, *id.* at 388, 625 A.2d 349:

What appellant's counsel did in this case—employing an investigator to question the jurors in the hope of finding some basis for impeaching their verdict—is precisely what the rule attempts to avoid. Jurors should not be subject to

such harassment, and the finality of judgments entered upon their verdicts should not be subject to such attacks, because these tactics do tend to erode public confidence in the judicial process.

■ The Court was not convinced that the segment prejudiced the foreman who saw the television show. *Id.* at 391, 625 A.2d 349. Therefore, it upheld the circuit court's ruling. *Id.* Nevertheless, *Smith* makes evident that, under some circumstances, a court may consider third-party testimony as to jury misconduct. *See id.* at 390, 625 A.2d 349. To that end, appellant relies on *Wernsing v. General Motors Corp.*, 298 Md. 406, 470 A.2d 802 (1984) and *Christ v. Wempe*, 219 Md. 627, 150 A.2d 918 (1959). *See also Ramirez v. State*, 178 Md.App. 257, 291, 941 A.2d 1141 (2008) (allowing bailiff's testimony about alternate juror's presence in jury room). We pause to review *Wernsing* and *Christ*.

In *Wernsing*, 298 Md. 406, 470 A.2d 802, a personal injury action, the jury rendered its verdict in favor of the Wernsings. *Id.* at 410, 470 A.2d 802. General Motors moved for a new trial because the foreman allegedly obtained and read from a dictionary, thereby causing four jurors to change their vote. *Id.* at 410–11, 470 A.2d 802. At the motion hearing, the court considered the jurors' affidavits; an affidavit from a bystander who stated that the foreman told her "that he had been able to obtain unanimity on question 2 by reading dictionary definitions to his colleagues"; testimony from the court bailiff that the foreman requested a dictionary, and that the bailiff gave him one; and writings made by the foreman while the jury deliberated, asking for clarification on "proximately," and quoting the dictionary definition of "legal." *Id.* at 410–14, 470 A.2d 802. The trial court denied the motion, reasoning that "permit[ting] jurors to overturn their verdicts by post-trial affidavits ... would create havoc." *Id.* at 414, 470 A.2d 802.

On appeal, the Court determined that consideration of the jurors' affidavits violated the "well-settled Maryland rule that a juror cannot be heard to impeach his verdict." *Id.* at 411, 470 A.2d 802. Further, the Court stated that post-verdict

affidavits from jurors were "a particularly gross example of soliciting a reconstruction of a juror's mental processes in reaching the verdict. This is precisely the type of attempted undermining of verdict finality which Maryland law does not permit." *Id.* at 412, 470 A.2d 802. In addition, the Court found that the third-party bystander's affidavit amounted to hearsay, and thus consideration of it was impermissible. *See id.* at 412, 470 A.2d 802. The Court stated: "The affidavit by the participant in the post-verdict conversation between certain jurors attempts to prove the truth of the content of the statements made by the foreman in that conversation," i.e., the statement was hearsay. *Id.* In contrast, it determined that the bailiff's testimony was "competent," and the foreman's notes, "[a]s documents generated during the jury's deliberations, [did] not suffer the taint of possible post-verdict importuning," and therefore constituted "competent proof." *Id.* at 413, 470 A.2d 802.

The Court expressed concern that prejudice from use of the dictionary was very likely because the foreman's notes indicated that the dictionary definitions led him to misunderstand proximate cause, and "the jury's findings concerning proximate cause controlled the major liability issues." *Id.* at 420, 470 A.2d 802. It stated: "If this approach to proximate cause were in fact applied by the jury, or even by [the foreman] alone, it would mean that all of the evidence, including expert opinions, in this protracted and complex products liability case would have been disregarded." *Id.* Although the Court declined to presume prejudice from the presence of the dictionary, *id.* at 416, 470 A.2d 802, it held that, given the high probability of prejudice, based on proof that the trial court could have considered (the bailiff's testimony and the foreman's notes), the circuit court abused its discretion in not granting a new trial. *Id.* at 420, 470 A.2d 802.

In *Christ, supra,* 219 Md. 627, 150 A.2d 918, a negligence action, the plaintiffs moved for a new trial, in part on the grounds of juror misconduct. *Id.* at 630, 640, 150 A.2d 918. In an affidavit in support of their motion, the court clerk averred that the forewoman asked the clerk, outside of the

presence of the rest of the jury, whether the jury had to answer the other questions if its answer to the first question was "no." *Id.* at 640, 150 A.2d 918. The affidavit further indicated that the clerk responded to the forewoman in the negative. *Id.* The court would not permit the plaintiffs to interrogate the jurors at the hearing, however, and it denied the motion. *Id.* at 641–42, 150 A.2d 918.

On appeal, the Court said: "In the *Williams* case we held that an affidavit of a juror will not be noticed on a motion for a new trial to disclose what took place in the jury room, and now we add that such information likewise may not be obtained through interrogation of individual jurors in open court." *Id.* at 641, 150 A.2d 918. In contrast, the Court concluded that the trial court properly considered the clerk's affidavit. *Id.* at 642, 150 A.2d 918. It reasoned: "The information contained in the affidavit of the court clerk presents a different situation because it emanates from one not a member of the jury panel and is based on his own knowledge. Such evidence should be received and considered by the court in ruling on a motion for new trial." *Id.* Noting that the trial judge, like the clerk, had instructed the jury that it did not have to answer the other questions if it answered "no" to the first question, the Court agreed with the trial judge that the "irregularity ... was insufficient to justify a new trial." *Id.* at 640, 642, 150 A.2d 918.

■■ Turning to the case *sub judice,* appellant apparently proffered evidence of third-party testimony of an investigator hired by defense counsel. As to what jurors allegedly told him, such evidence would have constituted hearsay,[7] akin to the third-party affidavit in *Wernsing,* 298 Md. at 412, 470 A.2d 802. Moreover, under Rule 5-606(b), appellant was not enti-tled to present testimony about "any matter or statement

---

7. Defense counsel conceded that he could not testify as to what a juror told him without withdrawing from the case. *See* Md. Rules of Prof'l Conduct R. 3.7 & cmt. 2–3 (lawyer generally prohibited from "serving as both advocate and witness" because the jury "may be confused or misled").

occurring during the course of the jury's deliberations." Asking the jurors directly about their deliberations, or asking a third party to provide hearsay testimony about the jury deliberations, would have constituted an inquiry into the validity of the verdict. Therefore, the trial court did not err or abuse its discretion in declining to consider such evidence under Rule 5–606(b).

We recognize that there are jurors who may well view the invocation of the right not to testify "as a shelter for wrongdoers." *Ullmann v. United States*, 350 U.S. 422, 426, 76 S.Ct. 497, 100 L.Ed. 511 (1956). Indeed, some jurors may "assume that those who invoke [the privilege against self-incrimination] are either guilty of a crime or commit perjury in claiming the privilege." *Id.* at 426, 76 S.Ct. 497 (footnote omitted). In the context of a criminal defendant's refusal to testify, the Supreme Court has acknowledged that, at times, "the inference of guilt for failure to testify as to facts peculiarly within the accused's knowledge is ... irresistible...." *Griffin v. California*, 380 U.S. 609, 614, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). Moreover, "[n]o judge can prevent jurors from speculating about why a defendant stands mute in the face of a criminal accusation...." *Carter v. Kentucky*, 450 U.S. 288, 303, 101 S.Ct. 1112, 67 L.Ed.2d 241 (1981).[8]

In this case, it is noteworthy that defense counsel recognized the difficulty when, in his closing argument, he explicitly told the jurors that it would be "against human nature" for them not to discuss appellant's failure to testify. Notably, he admonished the jury that, "if it comes up in deliberations,"

---

8. Here, the trial court told the jury not to consider appellant's failure to testify. We presume that the jury followed that instruction. "A jury is presumed to understand and follow the court's instructions." *Whittington v. State*, 147 Md.App. 496, 534, 809 A.2d 721 (2002), *cert. denied*, 373 Md. 408, 818 A.2d 1107, *cert. denied*, 540 U.S. 851, 124 S.Ct. 136, 157 L.Ed.2d 92 (2003); *see Veney v. State*, 251 Md. 182, 198, 246 A.2d 568 (1968), *cert. denied*, 394 U.S. 948, 89 S.Ct. 1284, 22 L.Ed.2d 482 (1969). Indeed, "our legal system necessarily proceeds upon the assumption that jurors will follow the trial judge's instructions...." *State v. Moulden*, 292 Md. 666, 678, 441 A.2d 699 (1982) (footnote omitted); *see Whittington*, 147 Md.App. at 534, 809 A.2d 721 (same).

they should "put it on" defense counsel, rather than blaming appellant for his failure to testify. In his closing argument, defense counsel made a tactical decision to confront the proverbial "elephant in the room"; he anticipated as inevitable that the jury would discuss appellant's silence. It seems disingenuous for appellant to now argue that, if the jury, indeed, discussed his failure to testify, the court should have granted a new trial on that basis.

We are also mindful that strict application of Rule 5–606(b) "may seem to offend the search for perfect justice." *United States v. Benally,* 546 F.3d 1230, 1233 (10th Cir.2008) (discussing Fed.R.Evid. 606(b)). Certainly, "the rule makes it difficult ... to ensure that jury verdicts are based on evidence and law rather than bias or caprice." *Id.* But, we agree with the Tenth Circuit that "decisions by ordinary citizens are likely, over time and in the great majority of cases, to approximate justice...." *Id.*

We hold that the trial court did not err or abuse its discretion in denying appellant's motion for new trial.

## II.

Appellant contends that the trial court erred in admitting his medical records into evidence because the State obtained them in violation of H.G. § 4–306(b)(7), a provision of the Confidentiality of Medical Records Act. He maintains that the statute permits law enforcement agencies to obtain confidential medical records by subpoena, without providing notice to the patient, "*only if* it is first established 'that the prosecution agencies and law enforcement agencies have written procedures to protect the confidentiality of the records.'" (Emphasis added.) According to Dorsey, the records were produced in violation of the Act because no proof was presented as to the existence of such written procedures. In addition, because the Fire Marshal later disclosed the records to the prosecutor, appellant claims that the "re-disclosure" violated H.G. § 4–302(d).

According to appellant, the violation of the Act constituted a violation of appellant's "constitutional expectation of privacy" in his medical records, for which "exclusion of the evidence is the proper remedy. . . ." He contends that the court must balance his interest "against the legitimate needs of certain entities, like government agencies to access this information."

 Moreover, appellant insists that any error was not harmless beyond a reasonable doubt, because the records provided "compelling evidence" in a circumstantial case. In this regard, he contends that the records allowed the State to establish the burns "to a medical certainty, and much more importantly, to date the burns [appellant] sustained to the night of the fire." Although Dorsey concedes that "there was other testimony from Deputy McG[h]ee and Mr. Turner that allowed the State to argue that the wounds on [appellant's] hand and face were burns," and "[t]he State had some testimony that showed [appellant] acknowledged being burned a week after the fire," the other evidence was "not nearly as effective- nor as conclusive." [9]

The State counters that "the trial court properly exercised its discretion to admit "the medical records," because the State "legally obtained" them." According to the State, the Fire Marshal had the authority to subpoena the medical records under P.S. § 6–310(b)(2), and the health care provider was required to disclose them under H.G. § 4–306(b)(7). Moreover, it claims that the Fire Marshal "was thereafter authorized to turn the medical records over to the State's Attorney's Office for prosecution, as that office could have

---

9. Appellant does not argue that the State obtained the documents in violation of HIPAA. As to HIPAA, he does no more than note that "at trial the defense objected on the ground that [the records] were ob- tained in violation of . . . the federal HIPPA [sic] statute," and that the trial court "eschewed the HIPPA [sic] objection, stating that the court was 'not going to focus on HIPPA [sic].' "

In any event, the State contends that any argument of a HIPAA violation fails because appellant "did not adequately raise any issue with regard to the federal statute upon which the trial court could rule." We agree.

obtained the records in the first instance." In addition, it argues that the Act does not mandate that the subpoena had to refer to or include the agency's written procedures to protect the confidentiality of records, nor did the State have to produce the written procedures at trial.

Further, citing Md. Rule 4–252(a), (b), the State argues that appellant waived this contention because, despite learning through discovery that the State had the medical records, he failed to file a timely pretrial motion for a protective order or to quash the subpoena. In addition, the State claims that, even if it violated a state statute concerning disclosure of medical records, "Maryland has no general, independent, exclusionary rule which allows or requires suppression of evidence in a criminal trial for violations of Maryland law, whether the alleged violation is constitutional or statutory in nature." Noting that "the legislature knows how to enact a statutory exclusionary rule if it so chooses," the State suggests that we may not embellish the Act by adding provisions that are not there.

Alternatively, the State contends that any error in the admission of the records was harmless beyond a reasonable doubt. In this regard, it maintains that the medical records were merely "cumulative to other evidence adduced at trial" that showed Dorsey had sustained burn injuries around the time of the arson.

As a preliminary matter, we address the State's contention that appellant waived the issue of the admissibility of his medical records.

Appellant concedes that he did not raise the matter until trial. But, the State has not referred us to any authority that suggests appellant had to move, pretrial, for a protective order so as to preserve his contention. The issuance of the subpoena for the medical records did not fall within the scope of Rule 4–252(a),[10] governing mandatory motions. Moreover,

---

**10.** Maryland Rule 4-252(a), (b) provides:
 **Rule 4–252. Motions in circuit court.**

appellant could not have filed a motion to quash a subpoena that he did not know had been issued. Therefore, appellant was not required to make a pretrial motion to preserve his challenge at trial to the admissibility of the records..

Before addressing the merits of appellant's claim that the Act controls here, and that the State violated the Act, we pause to review relevant provisions of the Act. H.G. § 4–302(d) provides:

§ 4–302. **Confidentiality and disclosure generally.**

\* \* \*

(d) *Redisclosure.*—A person to whom a medical record is disclosed may not redisclose the medical record to any other person unless the redisclosure is:

(1) Authorized by the person in interest;

(2) Otherwise permitted by this subtitle;

(3) Permitted under § 1–202(b) or (c) of the Human Services Article; or

(4) Directory information.

H.G. § 4–305 states:

§ 4–305. **Disclosures without authorization of person in interest-In general.**

---

(a) **Mandatory motions.** In the circuit court, the following matters shall be raised by motion in conformity with this Rule and if not so raised are waived unless the court, for good cause shown, orders otherwise:

(1) A defect in the institution of the prosecution;

(2) A defect in the charging document other than its failure to show jurisdiction in the court or its failure to charge an offense;

(3) An unlawful search, seizure, interception of wire or oral communication, or pretrial identification;

(4) An unlawfully obtained admission, statement, or confession; and

(5) A request for joint or separate trial of defendants or offenses.

(b) **Time for filing mandatory motions.** A motion under section (a) of this Rule shall be filed within 30 days after the earlier of the appearance of counsel or the first appearance of the defendant before the court pursuant to Rule 4–213(c), except when discovery discloses the basis for a motion, the motion may be filed within five days after the discovery is furnished.

(a) *Construction of section.*—This section may not be construed to impose an obligation on a health care provider to disclose a medical record.

(b) *Permitted disclosure.*—A health care provider may disclose a medical record without the authorization of a person in interest:

\* \* \*

(3) ... to a government agency performing its lawful duties as authorized by an act of the Maryland General Assembly or the United States Congress[.]

H.G. § 4–306 provides, in part:

### § 4–306. Same—Investigations.

(a) *Compulsory process.*—In this section, "compulsory process" includes a subpoena, summons, warrant, or court order that appears on its face to have been issued on lawful authority.

(b) *Permitted disclosures.*—A health care provider shall disclose a medical record without the authorization of a person in interest:

\* \* \*

(7) ... to grand juries, prosecution agencies, law enforcement agencies or their agents or employees to further an investigation or prosecution, pursuant to a subpoena, warrant, or court order for the sole purposes of investigating and prosecuting criminal activity, *provided that the prosecution agencies and law enforcement agencies have written procedures to protect the confidentiality of the records[.]* (Emphasis added.)

H.G. § 4–309 provides, in part:

### § 4–309. Refusal to disclose records; violations of subtitle; penalties.

\* \* \*

(c) *Violations of subtitle.*—A health care provider or any other person is in violation of this subtitle if the health care provider or any other person:

(1) Requests or obtains a medical record under false pretenses or through deception; or

(2) Discloses a medical record in violation of this subtitle.

(d) *Criminal penalties.*—Except as otherwise provided in subsection (e) of this section, a health care provider or any other person, including an officer or employee of a governmental unit, who knowingly and willfully violates any provision of this subtitle is guilty of a misdemeanor and on conviction is subject to a fine not exceeding $1,000 for the first offense and not exceeding $5,000 for each subsequent conviction for a violation of any provision of this subtitle.

(e) *Fraudulent obtaining of records; wrongful disclosure of records.*—(1) A health care provider or any other person, including an officer or employee of a governmental unit, who knowingly and willfully requests or obtains a medical record under false pretenses or through deception or knowingly and willfully discloses a medical record in violation of this subtitle is guilty of a misdemeanor and on conviction is subject to the following penalties [including fines and imprisonment].

(2) This subsection does not apply to an officer or employee of a governmental unit that is conducting a criminal investigation.

(f) *Civil penalties.*—A health care provider or any other person who knowingly violates any provision of this subtitle is liable for actual damages.

The Public Safety Article of the Maryland Code, on which the State relies, is also pertinent. Subtitle 3 of the Public Safety Article, titled "State Fire Marshal," is relevant. P.S. § 6–305 mandates that "[t]he State Fire Marshal shall enforce: (1) all laws of the State that relate to: ... (v) the suppression of arson...." To that end, the Fire Marshal has

the statutory authority to "investigate the origin or circumstances of a fire," P.S. § 6–309, and, in the case of an incendiary fire, based on testimony under oath, to "arrest the suspected incendiary or cause the suspected incendiary to be arrested and charged." P.S. § 6–311(a). Further, P.S. § 6–310(b) provides:

**§ 6–310. Testimony.**

\* \* \*

(b) *Witnesses, subpoenas, and oaths.*—The State Fire Marshal may:

(1) issue subpoenas requiring the attendance of witnesses to testify in relation to any matter that is the subject of an investigation by the State Fire Marshal under this subtitle;

(2) issue subpoenas requiring the production of documents that relate to any matter that is the subject of an investigation by the State Fire Marshal under this subtitle; and

(3) administer oaths to witnesses. . . .

As we have seen, H.G. § 4–306(b)(7) pertains generally to disclosures of medical records to various authorities, including "grand juries, prosecution agencies, law enforcement agencies or their agents or employees," while P.S. § 6–310(b)(2) confers express authority on the Fire Marshal to subpoena documents in connection with an arson investigation, without requiring written procedures if the documents pertain to medical records. The State Fire Marshal requested the medical records under the authority of P.S. § 6–310(b)(2). Therefore, the question arises as to whether P.S. § 6–310(b)(2) is subject to the provisions of H.G. § 4–306(b)(7) when the documents at issue are medical records.

The parties have not addressed the issue of the apparent conflict in the statutes. Nor have we found any cases concerning the conflict. Therefore, we turn to the principles of statutory construction.

"'The cardinal rule of statutory interpretation is to ascertain and effectuate the intent of the Legislature.'" *Chow v. State,* 393 Md. 431, 443, 903 A.2d 388 (2006) (citation omitted); *see Dep't of Health & Mental Hygiene v. Kelly,* 397 Md. 399, 419, 918 A.2d 470 (2007); *Mueller v. People's Counsel for Balt. County,* 177 Md.App. 43, 85–87, 934 A.2d 974 (2007), *cert. denied,* 403 Md. 307, 941 A.2d 1106 (2008). We are mindful that the General Assembly intended the Act "to protect the privacy of patients and to maintain the confidentiality of medical records, while establishing clear and certain rules for disclosure of those records." *Warner v. Lerner,* 348 Md. 733, 742, 705 A.2d 1169 (1998) (Raker, J., concurring). To that end, H.G. § 4–302(d) and § 4–309 provide "safeguards" against unauthorized disclosure of medical records. *Doe v. Md. Bd. of Soc. Work Examiners,* 384 Md. 161, 187, 862 A.2d 996 (2004). *See* 1990 Md. Laws, ch. 480, Preamble ("WHEREAS, In order to protect the privacy of a patient or recipient, that disclosure of information from a medical record without the authorization of a person in interest be limited to the information that is relevant to the purpose for which disclosure is sought and, when feasible and appropriate, to a review of the record by a person who acknowledges the duty not to redisclose the identity of the patient or recipient. . . .").

"When the statute is part of a larger statutory scheme, it is axiomatic that the language of a provision is not interpreted in isolation." *Anderson v. Council of Unit Owners of The Gables On Tuckerman Condominium,* 404 Md. 560, 572, 948 A.2d 11 (2008). Instead, "we analyze the statutory scheme as a whole," mindful of its purpose, "and attempt to harmonize provisions dealing with the same subject so that each may be given effect." *Id. See Bowen v. City of Annapolis,* 402 Md. 587, 613–14, 937 A.2d 242 (2007); *Magnetti v. Univ. of Md.,* 402 Md. 548, 565, 937 A.2d 219 (2007). As the Court explained in *State v. Ghajari,* 346 Md. 101, 115, 695 A.2d 143 (1997), "when two statutes appear to apply to the same situation, [the] Court will attempt to give effect to both statutes to the extent that they are reconcilable." But, when there is an irreconcilable conflict between two statutory provi-

sions, the more specific statute controls. *Prop. & Casualty Ins. Guar. Corp. v. Yanni*, 397 Md. 474, 492, 919 A.2d 1 (2007) ("Ordinarily, a specific enactment prevails over an incompatible general enactment in the same or another statute."). *See also Maryland–National Capital Park & Planning Comm'n v. Anderson*, 395 Md. 172, 183, 194, 909 A.2d 694 (2006); *Mayor of Oakland v. Mayor of Mountain Lake Park*, 392 Md. 301, 316–17, 896 A.2d 1036 (2006); *Ghajari*, 346 Md. at 116, 695 A.2d 143; *Dep't of Pub. Safety & Corr. Servs. v. Beard*, 142 Md.App. 283, 302, 790 A.2d 57, *cert. denied*, 369 Md. 180, 798 A.2d 552 (2002). "[T]he specific statute will be regarded as an exception to the general statute.'" *Anderson*, 395 Md. at 194, 909 A.2d 694 (citation omitted).

Assuming that P.S. § 6–310(b)(2) and H.G. § 4–306(b)(7) are part of the same statutory scheme, we are of the view that P.S. § 6–310(b)(2) is the more specific statute. Although it applies to all documents, it is expressly limited to the State Fire Marshall. In contrast, H.G. § 4–306 applies to all law enforcement agencies.[11]

Notably, when the Act took effect in 1990, the laws governing the State Fire Marshal, then codified at Md.Code (1990 Repl.Vol.), Art. 38A, § 8, had been in effect for twenty-six years. Those laws were not repealed or revised by the Act. *See* 1990 Md. Laws, ch. 480; 1964 Md. Laws, ch. 15. In the nearly two decades since H.G. § 4–306 was enacted, the Legislature repealed Art. 38A, § 8, and reenacted it, in part, as P.S. § 6–310, without making any substantive changes, despite its knowledge of H.G. § 4–306. *See* 2003 Md. Laws, ch. 5. In our view, if the Legislature intended H.G. § 4–

---

11. We recognize that P.S. § 6–310 permits the Fire Marshal to subpoena a variety of documents, not merely medical records. To that end, an argument can be made that the appropriate analysis concerns the nature of the documents under subpoena (governed by H.G. § 4–306), rather than the person who issues the subpoena (P.S. § 6–310). Under such a framework, if the Fire Marshal happens to issue a subpoena for medical records, the provisions of H.G. § 4–306(b)(7) would come into play. In our view, however, the specificity of P.S. § 6–310—applicable solely to the Fire Marshal—militates against such a construction.

306(b)(7) to apply to disclosure of medical records pursuant to subpoenas issued by the Fire Marshal, it would have repealed or revised P.S. § 6–310(b)(2), or it would have specifically included the Fire Marshal in H.G. § 4–306(b)(7).

Moreover, if we were to adopt appellant's position, we would render P.S. § 6–310(b)(2) superfluous. Arguably, we would also expand the scope of H.G. § 4–306(b)(7) to include the Fire Marshal. *See Stearman v. State Farm Mut. Auto. Ins. Co.,* 381 Md. 436, 454, 849 A.2d 539 (2004) ("We will not invade the province of the General Assembly and rewrite the law for them, no matter how just or fair we may think such a new law or public policy would be. The formidable doctrine of separation of powers demands that the courts remain in the sphere that belongs uniquely to the judiciary—that of interpreting, but not creating, the statutory law."); *Fister v. Allstate Life Ins. Co.,* 366 Md. 201, 219, 783 A.2d 194 (2001) ("It is the province of the State Legislature, not the courts, to expand the scope of [a statute]."). Any revision or clarification of H.G. § 4–306(b)(7) or P.S. § 6–310(b)(2) must come from the Legislature.

Alternatively, even if the Act controls here, it is salient that Advanced Urgent Care voluntarily complied with the subpoena. Therefore, this case is unlike *Shady Grove Psychiatric Group v. State,* 128 Md.App. 163, 736 A.2d 1168 (1999), which involved a provider's refusal to comply with a subpoena because of the lack of written procedures.

In that case, the State issued a subpoena to a psychiatric group in connection with an investigation of a "hate crime." *Id.* at 165–66, 736 A.2d 1168. The State sought " 'a list of patients who had appointments on 6/01/98 between 10:00 a.m. and 12:00 noon. Need addresses, dates of birth, phone numbers, and appointment history from February 1 to the present.' " *Id.* at 166, 736 A.2d 1168 (quoting subpoena). Shady Grove, the mental health care provider, refused to disclose the information, claiming "it was shielded from disclosure" under H.G. § § 4–301 through 4–309. *Id.* Thereafter, the State moved to enforce the subpoena and, following a hearing, the

circuit court ordered Shady Grove to produce the requested information. *Id.* We held that the health care provider was not obligated to disclose medical records until "the prosecution agency first proves that it has written procedures to protect the confidentiality of that record." *Id.* at 179, 736 A.2d 1168. Because there was no proof of written procedures, we concluded that "the subpoena should not have been enforced." *Id.*

To be sure, H.G. § 4–306(b)(7) requires a law enforcement agency to "have written procedures" before a health care provider may be *compelled* to comply with a subpoena. But, unlike in *Shady Grove*, the health care provider here did not contest the subpoena. Notably, H.G. § 4–305 "is a *permissive* disclosure provision." *Warner*, 348 Md. at 739, 705 A.2d 1169. It sets forth several circumstances under which a health care provider has discretion to disclose a medical record, without authorization of a person in interest. *Id.* Of relevance here, H.G. § 4–305(b)(3) permits a health care provider voluntarily to disclose medical records, without a patient's permission, "to a government agency performing its lawful duties . . . ." The text of H.G. § 4–305(b)(3) does not limit such disclosure to those government agencies that have written procedures.[12] Therefore, if the Act applied here, the health care provider was not required by the Act to ascertain whether the Fire Marshal had written procedures before it voluntarily elected to produce the medical records in response to the subpoena.[13]

In any event, the Act delineates remedies for its violation. As noted, the Maryland statute provides that "a health care provider or any other person, including an officer or employee of a governmental unit," may be fined if that person "knowingly and willfully requests or obtains a medical

---

12. As the *Warner* Court underscored, 348 Md. at 740, 705 A.2d 1169, a health care provider with discretion to disclose may nonetheless opt not to disclose. Instead, it may impose "conditions on a disclosure." *Id.* For example, it might "insist[ ] on a subpoena" or consult with the person in interest. *Id.*

13. We express no opinion as to whether such conduct would comply with HIPPA.

record under false pretenses or through deception"; "knowingly and willfully discloses a medical record in violation of this subtitle"; or "knowingly and willfully violates any provision of this subtitle...." H.G. § 4–309(d), (e)(1). Further, "a health care provider or any person who knowingly violates any provision of this subtitle" may be civilly liable for actual damages, H.G. § 4–309(f); and, outside the context of state actors conducting criminal investigations, "a health care provider or any other person, including an officer or employee of a governmental unit," may be subject to imprisonment. H.G. § 4–309(e). Of import here, the Act does not provide for an exclusionary rule as a remedy, and we shall not infer a remedy that the General Assembly did not authorize.

*Padilla v. State,* 180 Md.App. 210, 232–36, 949 A.2d 68, cert. denied, 405 Md. 507, 954 A.2d 468 (2008), is noteworthy. There, we considered the history of the federal exclusionary rule and its applicability to the states. *Id.* We noted that in *Parker v. State,* 402 Md. 372, 399–406, 936 A.2d 862 (2007), "the Court acknowledged ... that Maryland courts have, on occasion, recognized limited exclusionary principles on the basis of non-constitutional Maryland law." *Padilla,* 180 Md. App. at 236 n. 12, 949 A.2d 68; *cf. Herring v. United States,* —— U.S. ——, 129 S.Ct. 695, 699–704, 172 L.Ed.2d 496 (2009) (discussing federal exclusionary rule). Although the federal exclusionary rule applies for violations of the federal Constitution, we concluded in *Padilla* that violation of non-constitutional Maryland law does not render evidence inadmissible unless Maryland common law or a State statute provides for an exclusionary rule. *Padilla,* 180 Md.App. at 236 n. 12, 949 A.2d 68. We held that no exclusionary rule existed under State law for evidence allegedly seized in violation of Article 26 of the Maryland Declaration of Rights. *Id.* at 237, 949 A.2d 68. *See also Ford v. State,* 184 Md.App. 535, 567–71, 967 A.2d 210 (2009).

Finally, even if the trial court erred or abused its discretion in admitting the medical records, the error was harmless beyond a reasonable doubt. *See Spain v. State,* 386

Md. 145, 161, 872 A.2d 25 (2005); *Dorsey v. State,* 276 Md. 638, 659, 350 A.2d 665 (1976); *Whittington,* 147 Md.App. at 534, 809 A.2d 721. The medical records provided evidence that appellant burned his face and left hand on September 2, 2006, the night of the automobile fire; that appellant attributed the burns to his gas grill; and that appellant sought treatment on September 8, 2006. But, as we have seen, the records were cumulative to ample other evidence that showed that appellant burned his face and hands in the afternoon or evening of September 2, 2006; that he attributed the burns to his gas grill; and that he sought treatment for the burns at Advanced Urgent Care on September 8, 2006.[14]

**JUDGMENT AFFIRMED. APPELLANT TO PAY COSTS.**

---

14. As to appellant's claim that admission of the records violated his constitutional rights, this contention was not raised at trial, in the Motion for a New Trial, or at the motion hearing on January 16, 2008. Therefore, we decline to consider it. *See* Rule 8–131(a).